## Commonwealth *vs.* Jose Maldonado.

Hampden. April 6, 1999. - May 4, 1999.

Present: Wilkins, C.J., Lynch, Fried, Marshall, & Ireland, JJ.

*Evidence,* Relevancy and materiality, Motive, State of mind, Photograph. *Jury and Jurors. Practice, Criminal,* Jury and jurors, Comment by prosecutor, Duplicative convictions, Capital case. *Homicide. Assault and Battery by Means of a Dangerous Weapon.*

At the trial of murder indictments, the judge did not err in allowing the jury to hear evidence of the defendant's association with gangs, which was relevant to the defendant's motive and state of mind, and the judge took appropriate steps to minimize any prejudicial impact of the testimony. [504-505]

At a murder trial, the judge took sufficient steps to ensure that the jury remained impartial by discharging one juror who the judge deemed incapable of fulfilling his duty by reason of an extraneous influence, questioning the remaining jurors to ensure their impartiality, and thoroughly instructing the jury on their duty to remain impartial. [506-507]

At a murder trial, there was no error in the judge's admission of four autopsy photographs of the two victims. [507-508]

At a murder trial, no substantial likelihood of a miscarriage of justice arose from the prosecutor's closing argument. [508-509]

At a criminal trial, the defendant's convictions of assault and battery by means of a dangerous weapon on the two victims were not duplicative of the defendant's convictions of murder of the same victims. [509-510]

Indictments found and returned in the Superior Court Department on January 11, 1996.

The cases were tried before *Bertha D. Josephson,* J.

*James A. Couture* for the defendant.

*Deborah D. Ahlstrom,* Assistant District Attorney, for the Commonwealth.

Fried, J. The defendant, Jose Maldonado, appeals from two convictions of murder in the first degree, as well as one conviction of armed assault with intent to murder, three convictions of assault and battery by means of a dangerous weapon, and one conviction of illegal possession of a firearm. There is no basis

for relief pursuant to our power under G. L. c. 278, § 33E, to order a new trial or reduce the murder verdicts.

I

On the evening of December 6, 1995, the defendant, a member of the Latin Kings street gang, and three fellow gang members, Jason Souza, Thomas Birks, and Jose Velez, went, by automobile, to a bar in Holyoke. After consuming marijuana and alcohol, they were joined by Jose Sanchez, Felix Colon, and Linda Dukas. Sanchez had reportedly made unwanted sexual advances toward the sister of a high-ranking gang member who was in prison in Florida. The defendant had been ordered to exact revenge by killing Sanchez. He had previously shared these orders with Souza, Birks, and Velez. After the bar closed at 2 A.M., the group spent some time at a convenience store then bought beer and went to Springdale Park. Once at the park, everyone but the defendant left the vehicles. Souza then ordered Dukas to return to the vehicles, which she did. The defendant then stepped out of his vehicle, approached Colon, and shot him once in the head. He then went to the side of the vehicle and shot Sanchez in the head and reached in and shot Dukas in the neck. The defendant noticed Colon moving on the ground and fired a second shot at Colon. He then shot Sanchez again, went over and shook Dukas and, seeing she was still alive, shot her a second time as well. Out of ammunition, the defendant drove away from the scene with Souza, Birks, and Velez.

Dukas, however, survived the attack and, once the defendant and the others had left, ran bleeding from the scene and knocked on neighborhood doors in an attempt to summon help. When the police arrived, Dukas, unable to speak due to damage to her vocal chords, directed the officers to the park, where they found the bodies of Sanchez and Colon. After undergoing surgery, Dukas was questioned by the police. She indicated in writing that "Jose" shot her. She indicated that she did not know Jose's last name, but she led the police to the defendant by providing them with his street name, "Pops."

After a six-day trial, the defendant was found guilty on all charges by a jury. He was sentenced to two life terms on the murder convictions, from nineteen to twenty years on the conviction of armed assault with intent to murder, ten years on each of the three convictions of assault by means of a danger-

ous weapon, and from two and one-half to five years on the firearms conviction, all to be served concurrently.

## II

### A

The defendant contends that the judge erred by allowing evidence of the defendant's membership in the Latin Kings street gang. The defendant filed a pretrial motion in limine to exclude any evidence of his association with gangs. The judge denied the motion, allowing the prosecution to refer to anticipated evidence of gang involvement during opening arguments and allowing evidence of gang membership.

The judge did not err in allowing this evidence to be heard by the jurors. The Commonwealth's theory was that the shootings were ordered as retribution by a leader of the Latin Kings. Evidence of gang affiliation was relevant to the defendant's motive and state of mind. *Commonwealth* v. *Wilson*, 427 Mass. 336, 349 (1998) (evidence which shows defendant's state of mind found probative); *Commonwealth* v. *Weichell*, 390 Mass. 62, 73 (1983), cert. denied, 465 U.S. 1032 (1984) ("the Commonwealth is entitled to introduce all relevant evidence of motive"); *Commonwealth* v. *Borodine*, 371 Mass. 1, 8 (1976), cert. denied, 429 U.S. 1049 (1977) ("if there is evidence of motive, that evidence is admissible"). It was within the discretion of the judge to weigh the probative value of the evidence against its prejudicial effect. *Commonwealth* v. *Dunn*, 407 Mass. 798, 807 (1990) (determination "whether the probative value of relevant evidence is outweighed by its prejudicial effect [is] within the sound discretion of the judge"); *Commonwealth* v. *St. Germain*, 381 Mass. 256, 271 (1980) ("resolution of the question whether evidence of motive is more probative than prejudicial lies within the sound discretion of the trial judge"). As there was significant evidence indicating that the defendant's gang membership was essential to understanding the motivation behind the crimes, the judge was correct in allowing the evidence to be presented to the jury. See *Commonwealth* v. *Marrero*, 427 Mass. 65, 67-68 (1998) (evidence of involvement in drug dealing business admissible where relevant to motive for killing); *Commonwealth* v. *Rivera*, 424 Mass. 266, 273 (1997), cert. denied, 119 S. Ct. 346 (1998) (evidence should be admitted where it is necessary to

explain criminal act); *Commonwealth* v. *Bradshaw*, 385 Mass. 244, 269-270 (1982) (prosecution "entitled to present as full a picture as possible of the events surrounding the incident itself").

The judge took steps to minimize the prejudicial impact of this testimony. The judge questioned prospective jurors as to whether evidence of gang involvement or affiliation would prevent them from rendering an impartial verdict. Where jurors' answers were ambivalent or ambiguous the judge followed up, and where a juror doubted his ability to render impartial justice, he was excused. The judge again questioned the jurors midway through the trial after one juror had expressed fear for his safety after being approached at his place of work by a coworker when he went to pick up his pay check. At this point, the juror who expressed fear was removed, and the judge individually questioned the remaining jurors to assure that they had not been similarly contaminated by news reports or by the dismissed juror. The judge also gave the jurors a lengthy limiting instruction regarding the use of evidence of gang affiliation.[1] The evidence of gang membership was relevant, and the judge's handling of the matter was exemplary.

---

[1] The judge instructed the jurors that:

"[I]f there was evidence in this case regarding alleged gang association, I want to instruct you as follows, any suggestion that [the defendant] associated with people who belong to a gang cannot be used by you to infer anything about [the defendant]'s character or general propensity to commit a crime.

"If there was evidence to suggest to you that [the defendant] believed anyone to be affiliated with a gang, that is not evidence that that person was, indeed, a gang member, nor can it be used by you to infer that. Such evidence was admitted solely on the issue of [the defendant]'s state of mind for what he believed, at a particular time, and for no other purpose.

"I caution you and remind you of the promise you made to us under oath when you were questioned during the impanelment. Remember, you swore on your oath that you would not allow any suggestion of gang association to affect your ability to remain fair and impartial as a juror on this case, and you must follow that promise in your deliberations.

"The only purposes for which any evidence concerning alleged gang affiliation was introduced, was on the issue of what the Commonwealth claims may have been in [the defendant]'s mind, at a

## B

The defendant also complains that the trial was tainted by extraneous influence. As has been said, on the fifth day of trial, the defendant moved for a mistrial on the ground that one of the jurors had expressed fear of retribution due to the defendant's gang association, and the judge, after questioning all members of the jury, discharged the juror who had expressed trepidation but determined that the remainder of the jury had not been contaminated and denied the defendant's motion for a mistrial.[2]

The defendant also points out that one of the jurors admitted that he had heard either complete or partial news reports of the trial in which the defendant was described as an "enforcer" and a "hit man."[3] He also mentioned that some other members of the jury had been speculating as to the reason that "there was one juror that left this morning." This juror, however, was designated as an alternate and did not participate in the deliberations resulting in the defendant's convictions.

The trial judge has "discretion in addressing issues of extraneous influence on jurors discovered during trial." *Commonwealth* v. *Trapp*, 423 Mass. 356, 362, cert. denied, 519 U.S. 1045 (1996). See *Commonwealth* v. *Gallagher*, 408 Mass. 510, 517 (1990), citing *Commonwealth* v. *Amirault*, 404 Mass. 221, 232 (1989) ("Whether to declare a mistrial is within the trial judge's discretion"). The judge here took sufficient steps to satisfy herself that the jury remained impartial. She removed the one jury member she deemed incapable of fulfilling his duty,

particular time, to form a motive for the offenses involved.

"The fact that, if you believe it, [the defendant] associated with someone allegedly affiliated with a gang does not, standing alone, in any way, make [the defendant] more likely to commit a crime, nor more likely to be given to violence, and you are not to consider it as such."

[2]The dismissed juror stated that he did not discuss his fears with any of the other members of the jury nor did any of those members, when questioned, state that they were aware why the juror was dismissed.

[3]This juror said that he mentioned the fact that he had "heard something" to a few other jurors. When questioned, however, none of the other jurors remembered this comment.

One other juror indicated that he had heard the prosecutor's name on the radio and, as a result, immediately turned off the radio. This juror indicated that what he heard would not affect his ability to be impartial.

questioned the remaining jurors to assure herself of their impartiality, and administered thorough instructions regarding the duty of impartiality. In these circumstances, it was within the judge's discretion to determine whether the jury had remained impartial. There was no need to declare a mistrial. *Commonwealth* v. *Kamara*, 422 Mass. 614, 616-618 & n.1 (1996) (within trial judge's discretion not to declare mistrial after dismissing deliberating juror who told fellow jurors that she knew defendant, that he was member of a gang and that she feared for her safety, and that she thought he committed crime in question).

## C

The defendant further contends that the judge erred in allowing the prosecution to admit, over the defendant's objection, four autopsy photographs of the murdered victims. The defendant argues that, as the Commonwealth did not try him on a theory of extreme atrocity or cruelty, the only possible purpose for the admission of these photographs was "to inflame and shock the jury."

Although the defendant was not tried on a theory of extreme atrocity or cruelty, the Commonwealth was nevertheless obligated, in order to sustain the charge of murder in the first degree, to prove beyond a reasonable doubt that the defendant committed the killings with deliberate premeditation and malice aforethought. This is true whether or not the defendant actively disputes premeditation. *Commonwealth* v. *Jackson*, 428 Mass. 455, 464 (1998), citing *Commonwealth* v. *Bastarache*, 382 Mass. 86, 106 (1980). The proximity of the defendant to the victims at the time the shots were fired has a direct bearing on the issue of premeditation. The photographs corroborate the testimony that the victims were shot at close range. We have recently stated that "[i]t is settled law that photographs showing the nature and extent of the victim's injuries are admissible as evidence that the defendant killed the victim with deliberate premeditation." *Jackson, supra,* citing *Commonwealth* v. *Meinholz*, 420 Mass. 633, 635-636 (1995). Nor are photographs which have value on an evidentiary matter "rendered inadmissible solely because they are gruesome [or duplicative] or may have an inflammatory effect on the jury." *Id.,* quoting *Commonwealth* v. *Ramos*, 406 Mass. 397, 407 (1990). See *Meinholz, supra* at 636; *Commonwealth* v. *Berry*, 420 Mass. 95, 108

(1995); *Commonwealth* v. *Gallagher*, 408 Mass. 510, 519 (1990); *Commonwealth* v. *Repoza*, 382 Mass. 119, 129 (1980), *S.C.*, 400 Mass. 516, cert. denied, 484 U.S. 935 (1987); *Commonwealth* v. *Campbell*, 375 Mass. 308, 313 (1978); *Commonwealth* v. *Bys*, 370 Mass. 350, 359 (1976). Given the relevance of the photographs, the judge was correct in admitting the photographs into evidence.

## D

The defendant also claims that the prosecutor made improper comments during the course of her closing argument. Specifically, the defendant claims that the prosecutor suggested that defense counsel was attempting to direct the jury away from the truth, and denigrated the defendant's case. The defendant did not object to any of these statements at the time and thus this court is limited to review of whether the argument raises a substantial likelihood of a miscarriage of justice. *Commonwealth* v. *Mello*, 420 Mass. 375, 379-380 (1995); *Commonwealth* v. *Cosme*, 410 Mass. 746, 750 (1991); *Commonwealth* v. *Kozec*, 399 Mass. 514, 518 n.8 (1987).

As the Commonwealth points out, the defendant's claim of error on this issue barely rises to the level of appellate argument. Our review of the prosecutor's closing argument satisfies us that the comments in question were proper and did not create a substantial likelihood of a miscarriage of justice. The prosecutor's comments were in response to defense counsel's attacks on the Commonwealth's case and the credibility of its chief witness, claiming that it was the witness rather than the defendant who had committed the crimes. The language employed by the prosecutor in describing the tactics of the defense counsel in this case[4] was very similar to that which this court recently found proper in *Jackson, supra*.[5] As we explained, "the prosecutor may comment on defense tactics that jurors have witnessed themselves." *Id.* at 463. Moreover, the judge distinctly instructed the jury that arguments by the attorneys

---

[4]"You can take the path to seek the truth or you can take the path that [defense counsel] has paved for you this morning. One riddled with smoke screens, one smoke screen designed to try to deter you from your mission of finding the truth."

[5]Where the prosecutor warned of a "smoke screen" and "smoking mirrors" and referred to defense counsel as "a clever lawyer," *Commonwealth* v. *Jackson*, 428 Mass. 455, 463 (1998).

were not evidence, and that it was on the basis of the evidence alone that they must decide the case, fairly ensuring that statements of the attorneys would not have prejudicial effect. *Commonwealth* v. *Weaver*, 400 Mass. 612, 615-616 (1987) (judge's instructions sufficient to counteract possibility of prejudice).

### E

The defendant contends that, assuming he shot each of the victims twice as the jury found, the convictions of assault and battery with a deadly weapon on the two victims who died are duplicative of the murder convictions and therefore should be dismissed.[6] The defendant reasons that the shots were "so closely related in fact as to constitute in substance but a single crime." *Commonwealth* v. *St. Pierre*, 377 Mass. 650, 662-663 (1979). See *Commonwealth* v. *Sanchez*, 405 Mass. 369, 381 (1989) (same); *Commonwealth* v. *Thomas*, 401 Mass. 109, 120 (1987) (same).

Whether the shootings were separate and distinct acts or part of a single criminal episode was a question of fact for the jury to resolve. The judge properly instructed the jury, explaining that, "when you consider each of these three charges of assault and battery by means of a dangerous weapon, please remember that each crime must be proven to you . . . by proof of an act separate and distinct from any other crime for which the defendant is convicted," and that "the Commonwealth must prove that the act, which constituted the assault and battery by means of a dangerous weapon, was a separate and distinct act."[7]

Having been so instructed, the jury could reasonably have concluded that each shot constituted a separate and distinct act. The defendant shot each victim twice in a short period of time but, according to the testimony, the two shots at each victim were not consecutive. He shot each victim once but was not satisfied that they were dead, so he proceeded to shoot each a second time. After firing the first shot the defendant walked over to shoot the second victim then opened an automobile door

---

[6]For the shooting of the surviving victim the defendant was convicted of armed assault with intent to murder as well as assault and battery by means of a deadly weapon. The defendant does not claim that these convictions are duplicative.

[7]By way of illustration the judge explained that a defendant could not be convicted of murder for shooting a person in the stomach and also of assault and battery for that same act.

to shoot the third. At this point he stopped to determine whether he had succeeded in killing the victims and, noticing that one of the victims was still moving, repeated the sequence of events. The judge's instructions were correct, the jury are presumed to have followed those instructions, and there was evidence sufficient to support the required factual findings. It cannot be said that convictions of assault and battery by means of a dangerous weapon on the two victims who died were duplicative of the murder convictions as a matter of law.[8]

F

We have examined the entire record, as required by G. L. c. 278, § 33E, and conclude that there is no basis for ordering a new trial or directing the entry of murder verdicts of a lesser degree of guilt.

*Judgments affirmed.*

---

[8]The defendant further asserts that he cannot be convicted of assault and battery by means of a dangerous weapon because it is not clear that either of the murder victims survived the first shot. This too was a question of fact for the jury. The jury were instructed that the crime of assault and battery requires a living victim and that if the jurors had a reasonable doubt as to whether either murder victim survived the first shot they could not convict on both murder and assault and battery by means of a dangerous weapon. Given this instruction, the jury could reasonably have found that the murder victims survived for the time between the first shot and the time that each victim was shot a second time. The testimony indicated that only a few seconds elapsed between the firing of the first and last shots. The medical examiner opined that neither of the murder victims died instantaneously and that they may have remained aware of their surroundings following the first shot. The jury are presumed to have followed the judge's instructions. The medical examiner's testimony was sufficient to support the required findings of fact, and the jury could reasonably have found that testimony to be credible.