Commonwealth *vs.* Samuel Correa.

Hampden. March 8, 2002. - June 21, 2002.

Present: Marshall, C.J., Greaney, Ireland, Sosman, & Cordy, JJ.

*Jury and Jurors. Practice, Criminal,* Jury and jurors, Voir dire, Mistrial, Judicial discretion, Argument by prosecutor, Instructions to jury, Voluntariness of statement. *Evidence,* Motive, Relevancy and materiality, Hearsay, Spontaneous utterance.

At a criminal trial, the judge did not abuse his discretion in failing to declare a mistrial after several jurors reported an unusual incident on the second day of trial testimony, where the judge questioned each of the jurors regarding the incident and what they may have heard about it from others, assessed their ability to remain indifferent, and dismissed the only juror not found to be indifferent. [199-201]

At a murder trial, the judge did not err in admitting evidence of the defendant's gang affiliation, where the evidence was relevant to the defendant's motive for killing the victim, as well as to the motive and bias of witnesses at trial, and where the judge took care to minimize the prejudicial nature of the evidence; consequently, there was no error in the prosecutor's reference to the evidence in her closing. [201]

At a murder trial, the judge did not abuse his discretion in admitting evidence that a witness had heard a girl at the scene of the crime yell immediately after the victim had been shot, "Why did Sammy have to do that?," where the statement inferably was a spontaneous reaction to the traumatic event of the shooting, coming as it did immediately following and from the scene of the crime. [201-202]

At a criminal trial, the judge did not err in admitting in evidence a written statement given by the defendant to the police who questioned him, where the statement was voluntarily given, and certain questions by the police could not be understood as misinformation provided to the defendant, or as any assurance of leniency. [202-203]

Indictment found and returned in the Superior Court Department on November 18, 1998.

The case was tried before *Francis R. Fecteau,* J.

*Matthew A. Kamholtz* for the defendant.

*Marcia B. Julian,* Assistant District Attorney, for the Commonwealth.

Ireland, J. After a seventeen-day trial, the jury found Samuel

Correa guilty of murder in the first degree on theories of premeditation and extreme atrocity or cruelty in the shooting death of Hyovel Rosado. The defendant appeals from his conviction, claiming that the trial judge abused his discretion in failing to declare a mistrial after several jurors reported an unusual incident on the second day of trial testimony. He also claims that it was error to admit (1) evidence of the defendants'[1] gang affiliation; (2) hearsay testimony that following the shooting an unidentified person yelled, "Why did Sammy have to do that?"; and (3) the defendant's statement, in which he acknowledged having shot the victim. Because we conclude that these claims lack merit, and because we can discern no reason to exercise our extraordinary power under G. L. c. 278, § 33E, we affirm the conviction.

1. *Facts.* We summarize the facts as the jury could have found them, reserving certain details for discussion in conjunction with the issues raised.

a. *The shooting.* In the city of Holyoke, in the early afternoon of October 4, 1998, the victim asked Felix Oscar Caballero where he could buy some heroin. Caballero directed him to an area behind 787 Dwight Street. The victim was wearing black and gold beads around his neck, colors that Caballero considered indicative of membership in the Latin Kings gang.

At about 4 P.M., Caballero saw the victim cross Pine Street and enter 787 Dwight Street. Caballero then saw Angel Franco leave 108 Pine Street and walk to 787 Dwight Street. Franco looked in and ran back toward 108 Pine Street, yelling that there were members of the Latin Kings gang inside. A group of people, including the defendant, came running out of 108 Pine Street to 787 Dwight Street. Caballero recognized four of the men, including the defendant. He believed that they were all La Familia gang members.

The group arrived at 787 Dwight Street as the victim was leaving and they immediately set upon him. They repeatedly punched and kicked him before dragging him into the alley adjacent to the building. When the beating subsided, everyone except the defendant ran back toward 108 Pine Street. The

---

[1]The codefendants, David Morera and Angel Franco, are not parties to this appeal.

victim attempted to crawl out of the alley but collapsed next to the building. The defendant then pulled out a gun and shot the victim three times. As the defendant walked away, Caballero heard a girl who had been in the crowd around the beating yell, "Why did Sammy have to do that?" Caballero's ten year old son testified to having seen the defendant beat the victim, and Caballero's wife testified that after hearing three shots, she saw the defendant leaving the scene, tucking a gun into his pants as he ran.

b. *The statements.* On October 8, 1998, the defendant voluntarily accompanied police to the Holyoke police station and gave a written statement. In this statement he maintained that he only learned of the shooting after reading about it in the newspaper.

On October 19, 1998, Caballero and his family met with police and, for the first time, identified the defendant as the shooter. On October 20, 1998, the defendant was arrested, read his Miranda rights, and once again questioned by police. At first, he maintained that he was not in the area at the time of the shooting, but later changed his story to say that he was there but ran from the scene when he heard the shots. The officers then confronted him with the fact that witnesses had seen him beat and shoot the victim and then run away with the gun and asked, "Did you shoot him in cold blood or were you afraid? Did something happen that made you afraid?" The defendant responded that he had walked past the victim, who was "talking some shit" to him. The defendant said he told the victim to keep walking, but then the victim reached for something shiny in his waistband. He said that someone behind him passed him a gun, he fired a couple of shots at the victim, dropped the gun, and ran.

2. *Extraneous influence.* On the morning of the second day of trial testimony, juror 3-6 reported an incident that had occurred when she was leaving the court house the night before:

"It was like four or five of us walking together. We are not saying it is related to this court case, but it just was a little bizarre that when we got to almost the end of State Street a car pulled up next to us, two Spanish boys stopped

very quickly, pulled up to the side of us and made some comments none of us could understand and did a U-turn on State Street and took off. So we were a little concerned."[2]

The judge inquired of each of the jurors regarding the incident and what they may have heard about it from the others, and assessed their ability to remain indifferent. After the voir dire, the judge dimissed juror 3-6 only and denied the defendant's motion for a mistrial.

Where jurors "may have been exposed . . . to material that 'goes beyond the record and raises a serious question of possible prejudice,' [the judge] should conduct a voir dire of jurors to ascertain the extent of their exposure to the extraneous material and to assess its prejudicial effect." *Commonwealth* v. *Francis*, 432 Mass. 353, 369-370 (2000), quoting *Commonwealth* v. *Jackson*, 376 Mass. 790, 800 (1978). "Whether to declare a mistrial is within the trial judge's discretion." *Commonwealth* v. *Maldonado*, 429 Mass. 502, 506 (1999), quoting *Commonwealth* v. *Amirault*, 404 Mass. 221, 232 (1989). The defendant concedes that the judge "took appropriate steps to investigate" the concern, but contends that it was an abuse of discretion to have denied the motion for a mistrial in these circumstances.

The defendant's inference that the jurors involved "clearly saw the incident as threatening; and their fear was communicated to nearly the entire jury," is not borne out by the record. Juror 4-3 stated, "[N]othing was said. They didn't even look at us or anything like that. It was just funny that occurred. . . . Everybody's reaction was the same thing. . . . [W]e kind of laughed and walked off to our cars." Juror 4-14 described the incident as a "suspicious coincidence," and said that, while it had put him on his guard for a moment at the time, he did not take it as a threat. Juror 2-11 said that the group was "a little startled" or "a little scared" by the car's U-turn, but described the incident as "merely a coincidence, more like the person that pulled up next to us wanted to pull over close to the side of the road to pull a U-turn and go back

---

[2]Although the defendant's brief details additional issues discussed during this juror's voir dire, this incident is the sole basis for the defendant's claim, and we limit our treatment accordingly.

around." Juror 4-9 saw the car pull up next to the group of jurors and execute the U-turn, but "didn't think anything of it." None of the remaining jurors had anything substantive to say on the subject, and the judge found every juror, with the exception of juror 3-6, to be indifferent. There was no abuse of discretion.

3. *Evidence of gang affiliation.* The defendant next claims that the admission of evidence related to his and his codefendants' gang affiliations, as well as the prosecutor's references to these affiliations in closing argument, was prejudicial error. He claims there was no evidence that the assault and murder in this case were in any way gang related, and that admission of gang affiliation was "fundamentally irrelevant" and could only have served to inflame the jury. We disagree.

As explained in *Commonwealth* v. *Maldonado, supra* at 504-505, where evidence of gang affiliation is relevant to the defendant's motive, it is within the discretion of the judge to weigh the probative value of the evidence against its prejudicial effect. Gang evidence was relevant in this case as to the defendant's motive for the killing, as well as going to the motive and bias of witnesses at trial. See *id.* See also *Commonwealth* v. *Smiley,* 431 Mass. 477, 483-484 (2000); *Commonwealth* v. *Marrero,* 427 Mass. 65, 68 (1998). In addition, the judge took care to minimize the prejudicial nature of the evidence: He conducted individual voir dires of prospective jurors to ensure that they could be impartial despite any gang evidence; when gang evidence was admitted, the judge accompanied it with a limiting instruction and a reminder that they had sworn not to be influenced by evidence of gang membership; and the judge's final instructions to the jury included a limiting instruction that mirrored that approved in *Commonwealth* v. *Maldonado, supra* at 505 n.1. Because there was no error in the admission of the gang evidence, there was no error in the prosecutor's reference to that evidence in her closing.

4. *Hearsay.* The defendant contends it was prejudicial error to admit Caballero's testimony that he heard a girl in the crowd around the beating yell immediately after the shooting, "Why did Sammy have to do that?"

The statement is admissible as an excited utterance. Under

the excited utterance exception to the hearsay rule, a declarant's out-of-court statements are admissible where the utterance was made under the influence of the exciting event it qualifies, characterizes, or explains, and before the declarant has had time to contrive or fabricate. See, e.g., *Commonwealth* v. *Zagranski*, 408 Mass. 278, 285 (1990), and cases cited. There is no unavailability requirement. See *Commonwealth* v. *Whelton*, 428 Mass. 24, 29 (1998). The trial judge is given broad discretion on the admissibility of excited utterances. See *Commonwealth* v. *Zagranski, supra.*

The defendant argues that special concerns arise from the fact that the declarant in this case is unidentified. Particularly, he points to the lack of proof that the declarant actually perceived the shooting and the fact that the declarant's opportunity for reliable perception cannot be properly evaluated. Similar concerns were raised in *Commonwealth* v. *Rockett*, 41 Mass. App. Ct. 5, 5-6 (1996), where a burglar was hurrying away from the scene of the crime when an unknown voice called out, "David." As the court explained, "[T]he inference that the proponent is asking the jury to draw need not be the only plausible one." *Id.* at 7. Here, the statement inferrably was a spontaneous reaction to the traumatic event of the shooting, coming as it did immediately following and from the scene of the crime. There was no abuse of discretion here.

5. *Voluntariness.* The defendant next claims that his second written statement, taken by police on October 20, 1998, was not voluntarily given and that therefore its admission in evidence was error.

We grant substantial deference to the judge's findings on voluntariness. See *Commonwealth* v. *Raymond*, 424 Mass. 382, 395 (1997). The test is "whether, in light of the totality of the circumstances surrounding the making of the statement, the will of the defendant was overborne to the extent that the statement was not the result of a free and voluntary act." *Id.,* quoting *Commonwealth* v. *Selby*, 420 Mass. 656, 663 (1995). While "[m]isinformation by the police does not necessarily render a confession involuntary . . . police officers may not give an 'assurance, express or implied, that [confessing] will aid the defense or result in a lesser sentence.' " *Commonwealth* v. *Ray-*

*mond, supra,* quoting *Commonwealth* v. *Meehan,* 377 Mass. 552, 564 (1979), cert. dismissed, 445 U.S. 39 (1980). The questions, "Did you shoot him in cold blood or were you afraid? Did something happen that made you afraid?," cannot be understood as misinformation provided the defendant, or as any assurance of leniency. There was no error.

6. *G. L. c. 278, § 33E.* Finally, the defendant urges the court to order a new trial pursuant to its broad power under G. L. c. 278, § 33E. We have reviewed the record, and find nothing that caused a substantial likelihood of a miscarriage of justice. The defendant received a fair trial, and the verdict is consistent with the evidence.

*Judgment affirmed.*