******************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************

# STATE OF CONNECTICUT *v.* BRANDON JONES
## (SC 20840)

Mullins, C. J., and McDonald, D'Auria, Ecker,
Alexander and Dannehy, Js.

### *Syllabus*

Convicted of murder in connection with the shooting death of the victim, the defendant appealed. He claimed that the trial court improperly had admitted into evidence certain testimony related to his alleged gang affiliation and certain evidence related to his actions after law enforcement personnel attempted to arrest him. *Held*:

The trial court did not abuse its discretion in allowing evidence of the defendant's alleged gang affiliation, as the probative value of that evidence outweighed any unfair prejudicial impact.

The state offered the gang affiliation evidence to establish a motive for the shooting, there was a sufficient link between the defendant's gang affiliation and the shooting, and the trial court took steps to mitigate the danger of any unfair prejudice.

The trial court properly allowed evidence of the defendant's evasive conduct after law enforcement personnel attempted to arrest him, as such evidence was probative of the defendant's consciousness of guilt.

Although the defendant's evasive conduct occurred more than sixteen years after the shooting, that conduct occurred close in time to when law enforcement attempted to arrest him and to when he learned that the police had a reason for his arrest, which was a strong indicator of his consciousness of guilt.

Argued November 7, 2024—officially released February 25, 2025

### *Procedural History*

Substitute information charging the defendant with the crime of murder, brought to the Superior Court in the judicial district of Hartford and tried to the jury before *Schuman, J.*; verdict and judgment of guilty, from which the defendant appealed. *Affirmed.*

*Jeremy S. Donnelly*, with whom, on the brief, was *Bethany Phillips*, for the appellant (defendant).

*Denise B. Smoker*, senior assistant state's attorney, with whom, on the brief, were *Sharmese Walcott*, state's

attorney, and *John Fahey*, supervisory assistant state's attorney, for the appellee (state).

*Opinion*

DANNEHY, J. The defendant, Brandon Jones, appeals from the judgment of conviction, rendered after a jury trial, of murder in violation of General Statutes §§ 53a-8 and 53a-54a (a). On appeal, the defendant claims that the trial court (1) improperly admitted into evidence testimony related to the defendant's alleged gang affiliation, and (2) abused its discretion in admitting into evidence the defendant's actions after law enforcement attempted to arrest him in Louisiana to establish his consciousness of guilt. We disagree and, accordingly, affirm the judgment of the trial court.

The following facts, which the jury reasonably could have found, and procedural history are relevant to our resolution of this appeal. On June 21, 2005, the victim, Dante Davis, exited her apartment building, located at 131 Martin Street in Hartford, and walked to the corner store to buy milk for her baby. When she left her apartment building, there were a number of individuals outside. More specifically, a group of people stood on the handicap ramp located in the front of her apartment building, and others were closer to the street. Upon returning from the store, the victim stopped to talk to her boyfriend, Christopher Hough. Hough was standing near his vehicle, which was parked in front of the victim's residence. As they were talking, the defendant, along with two other individuals, Maurice Snowden and Shane Henriques, walked from a neighboring street, through a shortcut, and onto Judson Street, which runs perpendicular to Martin Street. The three men walked down Judson Street and fired several shots toward the victim's residence.[1] The defendant and Henriques used handguns, and Snowden used a shotgun.

---

[1] Judson Street runs perpendicular, from east to west, to Martin Street, which runs north to south, and a "T" is formed where the roads intersect. One hundred thirty-one Martin Street is located at that intersection.

The projectiles peppered the area, with one striking an apartment window, others ricocheting off the brick apartment building, some becoming embedded in the wooden handicap ramp, and several hitting cars on Martin Street. Among the shots fired, one bullet struck the victim in the head. After the firing stopped, Hough and his friend flagged down a passing car and transported the victim to the hospital, where she was pronounced dead. The medical examiner concluded that the victim's cause of death was a gunshot wound to the head and declared her death a homicide.

The initial investigation of the homicide resulted in no charges. Several years later, however, the police learned information about the homicide, first from Devon Downer and, later, from Veron Lloyd. In 2011, Downer was being investigated by the United States Drug Enforcement Administration (DEA) regarding unrelated activities. After Downer was arrested by the DEA, an agent interviewed him, at which time Downer offered information about the shooting and told the agent that he was on Martin Street when the shooting occurred. Downer provided a written statement to the agent in which he described three shooters but specifically identified only Snowden and Henriques. He was unable to identify the third shooter. The agent informed the Hartford police detectives assigned to the case about what Downer had reported.

In 2014, Lloyd first reached out to law enforcement with information about the homicide. Lloyd, who was incarcerated at that time, would not provide a formal statement. Approximately seven years later, while he was incarcerated on different charges, Lloyd again reached out to law enforcement. Ultimately, Lloyd testified at the defendant's trial pursuant to a cooperation agreement with the state.

The state obtained an arrest warrant for the defendant on January 3, 2022. The defendant was arrested in

Texas in February, 2022, and, after a four day trial in January, 2023, the jury found the defendant guilty of murder in violation of §§ 53a-8 and 53a-54a (a). Thereafter, the trial court rendered judgment in accordance with the jury's verdict and imposed a total effective sentence of forty-five years of incarceration. This appeal followed.[2] Additional facts and procedural history will be set forth as necessary.

I

The defendant claims that the trial court improperly admitted into evidence testimony regarding his alleged gang affiliation. Specifically, the defendant asserts that the testimony was not relevant to any issue in the case because the state failed to establish a link between his alleged gang affiliation and the charged crime. The defendant argues that, even if the testimony was relevant, it was far more prejudicial than probative and was so pervasive that it denied him a fair trial. We disagree.

A

Prior to trial, the defendant filed a motion in limine seeking to exclude evidence of his alleged gang affiliation and any evidence suggesting that the homicide was gang related based solely on the argument that such evidence was not relevant or that any relevance was outweighed by the danger of unfair prejudice. On the second day of trial, the court addressed this motion in limine, at which time the prosecutor provided the court with a proffer of the testimony that he intended to elicit. The prosecutor explained that multiple witnesses may testify on the subject but specifically outlined the testimony of Detective William Rivera, a retired member of the Hartford Police Department. The prosecutor informed the court that Rivera would testify that, in 2005, larger,

---

[2] The defendant appealed to the Appellate Court, and that appeal was subsequently transferred to this court pursuant to General Statutes § 51-199 (b) (3) and Practice Book § 65-4.

nationwide gangs in Hartford had fractured into "street crews." Rivera would explain that the Martin Street crew was associated with a larger crew called "West Hell," and that the Magnolia Street crew was associated with another crew called "The Ave."[3] Rivera would testify that West Hell and The Ave were rival gangs in an ongoing dispute, and that the defendant was associated with The Ave. The prosecutor asserted that Rivera's testimony concerning the defendant's gang affiliation was relevant to establish the defendant's motive for the shooting because it was reasonable to infer that the shooting was gang related.[4]

Defense counsel objected to the proffered evidence and argued that it was irrelevant because the shooting was not motivated by a particular event, and, even if it was relevant, it should be excluded on the ground of undue prejudice. The trial court, relying on prior cases in which the admission of gang affiliation evidence was permitted to prove motive, agreed with the prosecutor and denied the defendant's motion but stated its intention to provide a limiting instruction to the jury to minimize the danger of unfair prejudice.[5]

[3] For clarity, we refer to the Martin Street crew as "West Hell" and to the Magnolia Street crew as "The Ave."

[4] During the prosecutor's proffer, the court inquired as to whether there would be evidence that there were members of West Hell on Martin Street at the time of the shooting. The prosecutor did not state that such evidence would be presented, and, at trial, it was not presented. In response to the court's question, however, the prosecutor explained that there would be indications that the "fight was with people who were on Martin Street." At trial, Hough, Lloyd, and two law enforcement witnesses testified about an ongoing dispute between different groups in the North End of Hartford.

[5] After each witness that testified about the defendant's gang affiliation, the trial court instructed the jury: "You may not conclude that the defendant is more likely to have committed the crime or is a person of bad character merely because of evidence, if believed, that he was a member of or associated with a group or street crew. Evidence of gang activity, if believed, is admitted . . . only on the issue of whether the defendant had a motive to commit the crime and for that limited purpose only."

The court also included the following instruction on gang membership in its final charge to the jury: "The state produced evidence that the defendant

Rivera, who retired from the Hartford Police Department in 2015, testified that he worked for almost thirteen years in the intelligence unit, and one of the unit's primary goals was to gather information about guns, gangs or narcotics activities. He explained that the intelligence division created "rosters" of individuals associated with various gangs. Rivera did not explain how these rosters were created. Rivera testified that, in 2005, the gangs in Hartford disintegrated into "street crews." One of the street crews went by the name "The Ave." The Ave was based in the North End of Hartford, and its territory included Magnolia Street. He further explained that there was another gang located in the North End of Hartford called "West Hell." West Hell is based in the Westland Street area, and its territory includes Martin Street. He confirmed that, in the years around 2005, there were ongoing feuds that involved shootings between The Ave and West Hell, and that these shootings often occurred on Magnolia Street and Martin Street. After explaining the relationship between these two groups, Rivera identified the defendant, explained that he personally knew the defendant for about two or three years, and that the defendant was a member of The Ave. He did not testify as to how he knew that the defendant was a member of The Ave. Rivera also identified from photographs both Henriques and Snowden, and testified that they also were members of The Ave.

Michael Sheldon, a supervisory police inspector with the Connecticut Division of Criminal Justice, who had previously been the lead investigator in this case with the Hartford Police Department, testified that, prior to

was a member or associate of a gang or a street crew. If you credit or believe this evidence, you may use it only for the limited purpose of determining whether there was a motive for the crime. You may not conclude from the mere fact, if you find it, that, [if] the defendant was a member of a gang, that he was more likely to commit the crime charged, or that he was a bad person."

the victim's death, there were a lot of shootings on Martin Street. Hough also testified about the neighborhood in which the shooting took place, explaining that, in 2005, gunshots were frequently fired near Martin Street.

Lloyd identified the defendant as being one of the three shooters. Lloyd testified that, at the time of the shooting, he was on Martin Street and saw the defendant, Henriques, and Snowden on Judson Street, shooting toward Martin Street. Although Lloyd did not specifically identify the defendant, Henriques, or Snowden as members of The Ave, Lloyd testified that he knew they spent time at 109 Magnolia Street and that, later that night, he went to that address. When he arrived, he saw the defendant and Henriques. The defendant did not say anything about what happened on Martin Street. Henriques, however, told Lloyd that "[t]hey just went through . . . to the other side. Like, to the opposite side . . . [the] [o]ther side of the North End of Hartford, where [they were] beefing." When asked if there was "a beef going on between Martin Street and Magnolia Street" in 2005, Lloyd answered in the affirmative. Lloyd confirmed that there was an ongoing dispute between The Ave and West Hell gangs.

Christopher Reeder, a detective with the Hartford Police Department, also testified about gang affiliation and activity in the area around where the homicide took place. Reeder, who had been a police officer in Hartford for eighteen years at the time of the trial, stated that he was familiar with intelligence related to gang activity in Hartford. During his testimony, Reeder was shown two photographs and was asked to identify the individuals in the photographs. Reeder identified Henriques in one photograph and Snowden in the other and stated that they were both members of The Ave. He confirmed that "The Ave [was] associated with people from Magnolia Street who were also gang members . . . . ."

Reeder testified that he knew the defendant, and, over defense counsel's objection, identified the defendant as a member of The Ave. He reiterated The Ave's connection to Magnolia Street and stated that The Ave had ongoing disputes with other street gangs in Hartford, including West Hell, which was associated with Martin Street.

B

We begin with our standard of review and the legal principles that guide our analysis of the defendant's claim that the admission of gang affiliation evidence was harmful error. It is well known that we review the trial court's decision to admit or exclude evidence, if premised on a correct view of the law, for an abuse of discretion. *State* v. *Roy D. L.*, 339 Conn. 820, 830, 262 A.3d 712 (2021). In so doing, "[w]e will make every reasonable presumption in favor of upholding the trial court's ruling . . . ." (Internal quotation marks omitted.) *State* v. *Ortega*, 345 Conn. 220, 240–41, 284 A.3d 1 (2022).

We have explained that "[e]vidence is relevant if it tends to make the existence or nonexistence of any other fact more probable or less probable than it would be without such evidence. . . . To be relevant, the evidence need not exclude all other possibilities [or be conclusive] . . . ." (Internal quotation marks omitted.) *State* v. *Bermudez*, 341 Conn. 233, 249, 267 A.3d 44 (2021); see also Conn. Code Evid. § 4-1. "The relevance requirement . . . is a fairly low hurdle." *State* v. *Burney*, 288 Conn. 548, 565, 954 A.2d 793 (2008).

"Nonetheless, relevant . . . evidence may be excluded by the trial court if the court determines that the prejudicial effect of the evidence outweighs its probative value. . . . Of course, [a]ll adverse evidence is damaging to one's case, but it is inadmissible only if it creates undue prejudice so that it threatens an injustice

were it to be admitted. . . . The test for determining whether evidence is unduly prejudicial is not whether it is damaging to the defendant but whether it will improperly arouse the emotions of the [jurors]. . . . Reversal is required only whe[n] an abuse of discretion is manifest or whe[n] injustice appears to have been done." (Internal quotation marks omitted.) *State* v. *Bermudez*, supra, 341 Conn. 249–50.

We have previously addressed the admissibility of gang affiliation evidence and the need for courts to carefully evaluate its probative value to ensure that it is sufficiently significant to overcome the potential for unfair prejudice. In *Bermudez*, we advised that "courts must exercise caution whenever the state seeks to admit evidence of a defendant's affiliation with a gang," because gangs and gang activity invoke images of criminal behavior. Id., 250; see also, e.g., *United States* v. *Ozuna*, 674 F.3d 677, 681 (7th Cir. 2012) ("[t]here is no question that evidence of a defendant's gang affiliation is potentially prejudicial and inflammatory, as it poses the risk that the jury will associate gang membership with a propensity for committing crimes and find the defendant guilty by association"). We emphasized that under no circumstances should the evidence be admitted to demonstrate a defendant's criminal propensity or bad character. *State* v. *Bermudez*, supra, 250; see also, e.g., *United States* v. *McKay*, 431 F.3d 1085, 1093 (8th Cir. 2005) ("[w]hile [e]vidence of gang membership is admissible if relevant to a disputed issue . . . gang affiliation evidence is not admissible [when] it is meant merely to prejudice the defendant or [to] prove his guilt by association with unsavory characters" (citations omitted; internal quotation marks omitted)), cert. denied sub nom. *McKoy* v. *United States*, 547 U.S. 1174, 126 S. Ct. 2345, 164 L. Ed. 2d 859 (2006), and cert. denied, 549 U.S. 828, 127 S. Ct. 46, 166 L. Ed. 2d 48 (2006). We have also concluded, however, that gang

affiliation evidence is admissible if it is relevant to a material issue in the case, including the issue of motive. See, e.g., *State* v. *Bermudez*, supra, 252–53 (gang affiliation evidence was properly admitted to establish reason that witness delayed coming forward to police); *State* v. *Wilson*, 308 Conn. 412, 430, 64 A.3d 91 (2013) (gang evidence was properly admitted to establish motive for killing); *State* v. *Taylor*, 239 Conn. 481, 503, 687 A.2d 489 (1996) (same), cert. denied, 521 U.S. 1121, 117 S. Ct. 2515, 138 L. Ed. 2d 1017 (1997). Other jurisdictions have also concluded that the admission of gang evidence is proper to show motive. See, e.g., *United States* v. *Serrano-Ramirez*, 811 Fed. Appx. 327, 341–42 (6th Cir.) ("[g]ang relationships may also be probative of motive because they help explain why [a defendant] did what he did" (internal quotation marks omitted)), cert. denied,     U.S.     , 141 S. Ct. 399, 208 L. Ed. 2d 110 (2020); *United States* v. *Gordon*, 496 Fed. Appx. 579, 582–83 (6th Cir. 2012) (admission of evidence of gang membership was relevant to motive); *Commonwealth* v. *Maldonado*, 429 Mass. 502, 504, 709 N.E.2d 809 (1999) ("[e]vidence of gang affiliation was relevant to the defendant's motive and state of mind").[6]

In the present case, the prosecutor offered the gang affiliation evidence to establish a motive for the shooting. Although motive is not an element of the crime charged, we have "recognized the significance that proof of motive may have in a criminal case. . . . Evidence tending to show the existence or nonexistence of motive often forms an important factor in the inquiry as to the guilt or innocence of the defendant." (Internal

---

[6] We note that the defendant did not argue that the gang affiliation evidence was inadmissible under § 4-5 of the Connecticut Code of Evidence, which addresses evidence of other crimes, wrongs or acts. Rather, he simply raised issues with the probative value and prejudicial impact of the evidence under §§ 4-1 and 4-3 of the Connecticut Code of Evidence. We therefore need not address whether, or to what extent, gang affiliation evidence falls within § 4-5, or whether a different balancing is required under that rule.

quotation marks omitted.) *State* v. *Wilson*, supra, 308 Conn. 430. There is little doubt that the defendant's affiliation with The Ave and the testimony about the ongoing dispute between the rival gangs, if credited by the jury, provided a reason for an otherwise seemingly random shooting on Martin Street. The jury might reasonably have inferred that the defendant would have been more likely to participate in a shooting on Martin Street if he was associated with The Ave, which was feuding with its rival, West Hell, which operated on Martin Street.[7] See *State* v. *Bermudez*, supra, 341 Conn. 252 ("gang affiliation evidence may be relevant to show bias, prove identity, or explain an otherwise inexplicable act, but these reasons are not exclusive" (internal quotation marks omitted)), quoting *State* v. *Dean*, 310 Kan. 848, 862, 450 P.3d 819 (2019).

Nevertheless, the defendant asserts that the gang affiliation evidence was irrelevant in this case because "the state failed to establish a clear nexus" between the alleged gang affiliation and the charged crime. Although he concedes that there was other evidence presented of a dispute, or " 'beef,' " between Magnolia Street and Martin Street, the defendant maintains that the references to this dispute were too vague and unspecific to suggest that this particular shooting was gang related. He relies on the fact that there was neither any evidence presented of a specific dispute that would

---

[7] On appeal, the defendant argues that there was no factual evidence that he was affiliated with The Ave but, rather, only expert conclusions by Rivera and Reeder to that effect. This claim ignores that both Rivera and Reeder testified that they knew the defendant and that he was a member of The Ave, without specifying the basis for their knowledge. On this record, therefore, we cannot determine whether the witness' statements were, in fact, based on personal knowledge, based on hearsay, or offered as expert opinions. The defendant's only objection to the admission of the evidence was on the grounds of relevance and prejudice, and, so, any questions about whether there was an adequate foundation for the admission of this testimony are not before us.

have motivated the shooting nor any evidence that any rival gang members were present on Martin Street at the time of the shooting. We disagree.

The testimony of Hough, Rivera, Lloyd, Reeder, and Sheldon established a sufficient link between the defendant's gang affiliation and the shooting to satisfy the relevance threshold.[8] These witnesses testified that, around the time of the murder in this case, there were frequent gunshots in the area of Martin Street. The state's witnesses also explained that the shooting took place in West Hell's territory, on Martin Street, and that West Hell was in an ongoing dispute that involved shootings with The Ave, the gang with which the defendant was affiliated. Given the defendant's affiliation with The Ave, and the fact that the shooting occurred in the area associated with its rival, West Hell, the state sufficiently established that the gang evidence was relevant to prove motive.

The defendant argues that the gang affiliation evidence had no probative value and was highly prejudicial because its submission risked unduly arousing the jurors' emotions and hostility toward him. We are not persuaded. First, the record reflects that the trial court was fully aware of the potential for unfair prejudice and, in admitting the evidence, made clear that it would provide a limiting instruction to ensure that the jury understood the purpose for which the evidence was offered. The trial court gave the limiting instruction after Rivera testified, after Reeder testified, and again in its final charge. See footnote 5 of this opinion; see also, e.g., *State* v. *Bermudez*, supra, 341 Conn. 253 (limiting instruction on proper use of gang affiliation testi-

---

[8] The state does not need to prove beyond a reasonable doubt that the shooting was gang related to meet the relevance threshold as it relates to motive. Indeed, as the commentary to § 1-3 (a) of the Connecticut Code of Evidence indicates, only a fair preponderance of the evidence is required. Conn. Code Evid. § 1-3 (a), commentary.

mony minimized prejudicial impact). Second, the testimony concerning the defendant's gang affiliation was relatively brief and, therefore, not pervasive. The defendant's affiliation with The Ave and Magnolia Street was discussed explicitly by only two witnesses, Rivera and Reeder. Although Lloyd stated that the defendant spent time on Magnolia Street, he did not testify that the defendant was affiliated with a gang. During closing argument, the prosecutor mentioned the defendant's gang affiliation briefly and only in the context of evidence of a motive or reason for the shooting. On the basis of the facts of this case, and particularly in light of the steps taken by the trial court to minimize the danger of any unfair prejudice, we conclude that the probative value of the evidence outweighed any unfair prejudicial impact, and the trial court did not abuse its discretion in admitting the gang affiliation evidence.[9]

II

The defendant next claims that the trial court abused its discretion in admitting evidence of his conduct after United States marshals attempted to arrest him at his mother's home in Louisiana. He contends that this evidence, which the state introduced to show his consciousness of guilt, was not relevant to consciousness of guilt because the jury could not have reasonably inferred that his actions two decades after the homicide were influenced by his involvement in the charged offense. He further contends that, even if the evidence was somehow relevant to showing consciousness of

---

[9] The defendant claims that the trial court's evidentiary error was of constitutional magnitude because it deprived him of his due process right to a fair trial. Because we conclude that there was no evidentiary error, we also conclude that there was no cognizable federal or state constitutional error. See, e.g., *State* v. *Bennett*, 324 Conn. 744, 764, 155 A.3d 188 (2017) (concluding that, because trial court's evidentiary ruling was not improper, defendant's constitutional claim that his right to present defense was violated failed).

guilt, it was improperly admitted because its prejudicial impact greatly exceeded its probative value. We disagree.

A

Prior to trial, the defendant filed a motion in limine seeking to exclude any anticipated consciousness of guilt evidence. The court addressed this motion on the fourth day of trial, at which time the court asked the prosecutor to provide a proffer of the anticipated testimony. The prosecutor initially provided the court with background information, because the consciousness of guilt evidence included information that could have resulted in defense counsel's being a witness at trial. The prosecutor explained that, on January 4, 2022, one day after the state obtained an arrest warrant for the defendant, law enforcement learned that the defendant was living out of state. The Hartford Police Department's fugitive task force and the United States Marshals Service, became involved in the investigation. They discovered the defendant's phone number, obtained a search warrant to locate the phone, and finally determined that the defendant was in Louisiana at his mother's home. United States marshals went to the home of the defendant's mother to locate the defendant and to let his mother know there was a warrant for his arrest. It was the prosecutor's position that, shortly after this visit, defense counsel called one of the assistant state's attorneys assigned to the present case and said something to the effect that the defendant was aware of the warrant. According to the prosecutor, the assistant state's attorney told defense counsel that the defendant should turn himself in. Without agreeing with the prosecutor, defense counsel noted that he was contacted by the defendant on or about January 28, 2022, which prompted him to call the assistant state's attorney assigned to the present case. Defense counsel would not, however, agree to any stipulation as to the

defendant's knowledge of the arrest warrant. The court asked the prosecutor and defense counsel to propose a "work-around" that would avoid defense counsel from becoming a witness but would establish that the defendant knew about the arrest warrant.

The prosecutor proffered that Detective Zachary Sherry, a member of the Hartford Police Department's fugitive task force, would testify that the defendant's cell phone, which was being tracked, was turned off shortly after the United States marshals attempted to arrest him at his mother's home in Louisiana. The prosecutor proffered that Sherry would also testify that the defendant secured a new cell phone with a new cell phone number, and that the United States marshals ultimately found him in Houston, Texas, where they took him into custody.[10] The prosecutor noted that it was the defendant's attempts to evade police capture after they visited his mother's home with a warrant for his arrest, and not his failure to turn himself in to the police, that constituted evidence from which a jury could find consciousness of guilt.

Subject to resolving the question of the defendant's notification regarding the arrest warrant, the trial court agreed with the prosecutor that the proffered evidence was probative of consciousness of guilt and that it was not unduly prejudicial. The court accordingly denied the defendant's motion to preclude the admission of that evidence. The court, however, reserved ruling on whether to charge the jury on consciousness of guilt.[11]

---

[10] During oral argument on the motion in limine to exclude this evidence, defense counsel orally modified what the defense had labeled as a motion in limine to a basic objection to the proffered testimony on the grounds of relevance and unfair prejudice.

[11] The court ultimately declined to give a consciousness of guilt instruction. The court noted that, during the charge conference in chambers, defense counsel requested that no consciousness of guilt instruction be given. In denying the defendant's motion for a new trial, which challenged, in part, the admission of the proffered consciousness of guilt evidence, the court explained that, in admitting the evidence, it did not feel that the evidence rose to a level that necessitated a consciousness of guilt instruction, but it

The court took a recess prior to Sherry's testimony to further address the question of the defendant's knowledge of the warrant. After the recess, the court did not put on the record how the issue was resolved. The prosecutor proceeded to call Sherry to testify. Sherry explained that, at some point in 2022, he was assigned to apprehend the defendant in connection with an arrest warrant. After learning that the defendant was residing outside of Connecticut, Sherry engaged the assistance of the United States Marshals Service to locate the defendant. He explained that they had been tracking the defendant's cell phone and, in January, 2022, determined that the defendant was at his mother's home in Louisiana. Sherry testified that the United States marshals went to the home of the defendant's mother and attempted to execute the warrant but that the defendant was not present at that time. Within hours after the United States marshals entered the mother's home to arrest the defendant, the defendant's phone, which was being tracked was no longer in service. Within the next few weeks, when the United States marshals learned of a new cell phone number that the defendant was using, they applied for a new search warrant to track that phone number and successfully located and arrested him in Houston, Texas. Immediately after Sherry testified, the prosecutor recalled Sheldon, who testified that the defendant was aware of the existence of the warrant in this case as of January 28, 2022. Defense counsel did not cross-examine Sheldon on this testimony. The prosecutor introduced a stipulation that the defendant was taken into custody in Houston, Texas, on February 24, 2022, and returned to Connecticut on March 4, 2022.

B

We begin by setting forth the applicable standard of review and relevant legal principles. It is well estab-

---

still believed that the evidence should be admitted because it showed some consciousness of guilt.

lished that "evidence is admissible to prove consciousness of guilt if, first, it is relevant, and second, its probative value outweighs its prejudicial effect." *State* v. *Hill*, 307 Conn. 689, 698, 59 A.3d 196 (2013). "We will make every reasonable presumption in favor of upholding the trial court's [evidentiary] ruling, and only upset it for a manifest abuse of discretion. . . . [Thus, our] review of such rulings is limited to the questions of whether the trial court correctly applied the law and reasonably could have reached the conclusion that it did." (Internal quotation marks omitted.) Id., 700.

We have explained that consciousness of guilt evidence "is relevant to show the conduct of an accused . . . subsequent to the alleged criminal act, which may fairly be inferred to have been influenced by the criminal act." (Internal quotation marks omitted.) *State* v. *DePastino*, 228 Conn. 552, 563, 638 A.2d 578 (1994). Evidence that an accused has taken some kind of evasive action to avoid detection or prosecution for a crime, such as flight, is quintessential consciousness of guilt evidence. See *State* v. *Oliveras*, 210 Conn. 751, 759, 557 A.2d 534 (1989); see also, e.g., *State* v. *Rhodes*, 335 Conn. 226, 243, 249 A.3d 683 (2020). "[T]he fact that ambiguities or explanations may exist [that] tend to rebut an inference of guilt does not render [such] evidence . . . inadmissible but simply constitutes a factor for the jury's consideration." (Internal quotation marks omitted.) *State* v. *Coccomo*, 302 Conn. 664, 670, 31 A.3d 1012 (2011). "[I]t is the province of the jury to sort through any ambiguity in the evidence in order to determine whether [such evidence] warrants the inference that [the defendant] possessed a guilty conscience." (Internal quotation marks omitted.) Id.

The defendant contends that the evidence the state introduced to show consciousness of guilt was too remote from the murder, and, so, the jury could not reasonably have inferred that his actions were influ-

enced by his involvement in the charged offense. In other words, he contends that, the more remote in time the evasive conduct is from the commission of an offense, the greater the likelihood that the evasive conduct was the result of something other than an acknowledgment of guilt concerning that offense.

Although the passage of time between the commission of a crime and the defendant's purported evasive conduct is certainly a relevant consideration in our assessment of the probative value of that evidence, the defendant fails to recognize that temporal proximity to the underlying offense is not the only consideration in determining whether the evidence is probative of the defendant's consciousness of guilt. Indeed, evidence of evasive conduct that occurs close in time after a defendant learns that he is accused of committing the charged offense creates a strong inference that his actions were motivated by a guilty conscience. See, e.g., *United States* v. *Russell*, 662 F.3d 831, 851 (7th Cir. 2011) ("[when] a defendant flees in the immediate aftermath of a crime *or shortly after he is accused of committing the crime*, the inference that he is fleeing to escape capture and prosecution is strong" (emphasis added)), cert. denied, 566 U.S. 914, 132 S. Ct. 1816, 182 L. Ed. 2d 634 (2012). In *State* v. *Kelly*, 256 Conn. 23, 55, 770 A.2d 908 (2001), we rejected a claim by a defendant that evasive conduct, such as flight, is probative of an individual's guilty conscience only when that flight occurs immediately after the alleged criminal conduct. We explained that evasive conduct "that occurs in close temporal proximity to other significant events in the course of a prosecution . . . also may be probative of the defendant's guilt." (Internal quotation marks omitted.) Id. In other words, when the evasive conduct occurs a substantial time after the crime, courts will place significance on whether the evasive conduct occurred close in time to the defendant's learning that he was

accused of or sought for the crime, or whether there was another significant event in the course of the prosecution that was soon to commence. See, e.g., id., 55–56; see also, e.g., *United States* v. *Jackson*, 572 F.2d 636, 641 (7th Cir. 1978) ("in cases in which a defendant's flight occurs a substantial time after the crime, we will place significance on a defendant's knowledge that he is accused of or sought for the crime charged"). In a case in which there is no such evidence, whether direct or circumstantial, that the defendant had the requisite knowledge or that there was a significant event in the prosecution that was to take place, it is likely that the admission of the evidence would be improper.

In the present case, United States marshals learned that the defendant was at his mother's home in Louisiana in January, 2022, and went there to arrest him. Almost immediately after going to his mother's home, the defendant's phone, which the police had been tracking, went out of service. The record shows that the defendant knew of the arrest warrant as of January 28, 2022. Several weeks later, the police determined that the defendant was using a new phone number and that he had fled to Houston, Texas, where he was arrested on February 24, 2022. On the basis of this evidence, the jury could reasonably conclude that the defendant knew about the warrant and took his phone out of service to avoid capture and prosecution for the charged offense. The evidence offered by the state, therefore, clearly was relevant to and probative of the defendant's consciousness of guilt. Although the defendant contends that his actions were too ambiguous and remote to constitute consciousness of guilt, his evasive conduct occurred in close temporal proximity to the time when law enforcement attempted to arrest him and he learned that the police had a warrant for his arrest, which are strong indicators that he intended to evade arrest and to avoid prosecution. We therefore

disagree with the defendant that the prejudicial impact of the evidence outweighed its probative value.

Finally, the defendant posits an alternative explanation for his behavior, suggesting that "any person in [his] situation would attempt to put [his] affairs in order . . . before surrendering." Even if we were to agree with the defendant's posited explanation, we disagree that the trial court abused its discretion in admitting this evidence. The evidence was not offered to establish that the defendant failed to turn himself in after becoming aware of the arrest warrant. In closing argument, the prosecutor argued that, if the jury found from the evidence that the defendant was trying to evade capture when he went to Texas and took his phone out of service, it could consider that as evidence of consciousness of guilt. The fact that there may have been other possible explanations for the defendant's conduct goes to the weight of the evidence presented, not to its admissibility, and is a question of fact for the jury. See, e.g., *State* v. *Scott*, 270 Conn. 92, 105, 851 A.2d 291 (2004) ("the fact that ambiguities or explanations may exist [that] tend to rebut an inference of guilt does not render evidence of flight inadmissible but simply constitutes a factor for the jury's consideration" (internal quotation marks omitted)), cert. denied, 544 U.S. 987, 125 S. Ct. 1861, 161 L. Ed. 2d 746 (2005). Accordingly, we conclude that the trial court did not abuse its discretion in admitting evidence of the defendant's conduct after United States marshals attempted to arrest him at his mother's home in Louisiana.

The judgment is affirmed.

In this opinion the other justices concurred.