# STATE OF CONNECTICUT *v.* JAROD HAMILTON
## (SC 20806)

Mullins, C. J., and McDonald, D'Auria, Ecker,
Dannehy and Bright, Js.*

*Syllabus*

Convicted of murder and carrying a pistol or revolver without a permit, the defendant appealed to this court. The defendant claimed, inter alia, that the trial court had improperly admitted into evidence two recorded police interviews of C, the state's key witness, as prior inconsistent statements under *State* v. *Whelan* (200 Conn. 743) and the corresponding provision (§ 8-5 (1)) of the Connecticut Code of Evidence on the ground that C's trial testimony was not inconsistent with the statements he had made during those interviews. *Held*:

The trial court abused its discretion in admitting C's two recorded police interviews under *Whelan* and § 8-5 (1) of the Code of Evidence because, although C was an uncooperative witness, the state failed to sufficiently demonstrate that C refused to testify or that his trial testimony was otherwise inconsistent with the statements he had made during the interviews.

Although a witness' denial of recollection can constitute an inconsistency, the record must be clear regarding what the witness does not recall in order for a court to adequately determine whether an inconsistency between trial

---

* This case originally was scheduled to be argued before a panel of this court consisting of Chief Justice Mullins and Justices McDonald, D'Auria, Ecker, Dannehy and Bright. Although Justice McDonald was not present at oral argument, he has read the briefs and appendices and listened to a recording of oral argument prior to participating in this decision.

State *v.* Hamilton

testimony and a prior statement exists, and, in the present case, C testified ambiguously about his lack of recollection, and the prosecutor failed to probe C as to what he did and did not recall and did not attempt to refresh C's recollection to lay a proper foundation to demonstrate that C's testimony was inconsistent with his statements to the police.

Moreover, even if a refusal to testify about a particular subject could constitute an inconsistency with a prior statement in some circumstances, the prosecutor failed to lay a proper foundation to demonstrate that C refused to testify, and the prosecutor should have taken additional steps to encourage or prompt C to respond to her questions or have enlisted the trial court's assistance in doing so.

The trial court's error in admitting the two interviews was not harmless, because, other than C in the improperly admitted interviews, no one else identified the defendant as the shooter or as the person in the video surveillance footage of the crime scene, and there was no other physical evidence that otherwise connected the defendant to the murder.

This court clarified that a witness' prior inconsistent statement admitted under *Whelan* and § 8-5 of the Code of Evidence can include not only a statement that is expressly made by the witness but also a statement that is adopted by the witness if such adoption is unequivocal, positive, and definite in nature, so as to meet the definition of "[s]tatement" set forth in § 8-1 (1) of the Code of Evidence, which defines that term for purposes of the rule against hearsay and its exceptions.

The trial court improperly delegated to the jury the responsibility of determining which statements of C's father, made during C's second interview with the police, were adopted by C and would therefore have been potentially admissible under *Whelan* as adopted prior inconsistent statements, rather than deciding the issue of admissibility on its own and excluding from the jury's consideration any statements that it determined were inadmissible.

The trial court did not abuse its discretion in allowing the prosecutor to introduce into evidence certain photographs and a video from the defendant's social media accounts, as the challenged evidence, viewed in context with other evidence in the record, was clearly probative of the defendant's identify as the individual who shot the victim, and there was no merit to the defendant's claim that the challenged evidence was too tenuous for purposes of § 4-3 of the Code of Evidence.

Argued March 6—officially released July 1, 2025

*Procedural History*

Substitute information charging the defendant with the crimes of murder and carrying a pistol or revolver

State *v.* Hamilton

without a permit, brought to the Superior Court in the judicial district of Fairfield and tried to the jury before *Hernandez, J.*; verdict and judgment of guilty, from which the defendant appealed to this court. *Reversed; new trial.*

*Daniel J. Krisch*, assigned counsel, for the appellant (defendant).

*Ronald G. Weller*, senior assistant state's attorney, with whom, on the brief, were *Brett R. Aiello*, former assistant state's attorney, *Joseph T. Corradino*, state's attorney, and *Colleen Zingaro*, former senior assistant state's attorney, for the appellee (state).

*Opinion*

DANNEHY, J. A jury found the defendant, Jarod Hamilton, guilty of murder in violation of General Statutes § 53a-54a (a) and carrying a pistol or revolver without a permit in violation of General Statutes (Rev. to 2017) § 29-35 (a), in connection with the shooting death of the victim, Khali Davis. In this direct appeal,[1] the defendant claims that the trial court improperly admitted into evidence two recorded police interviews of the state's witness, Daequan Carr, as prior inconsistent statements under *State* v. *Whelan*, 200 Conn. 743, 752, 513 A.2d 86, cert. denied, 479 U.S. 994, 107 S. Ct. 597, 93 L. Ed. 2d 598 (1986), because Carr's testimony at trial was not inconsistent with his two prior interviews with the police. He further claims that Carr's second recorded interview with the police was also inadmissible under *Whelan* because it contained statements of Carr's father, Dennis Cobia, who accompanied Carr at the interview, which the court allowed into evidence to the extent Carr adopted those statements as his own. The defendant claims that adopted statements of a witness should not be admissible as prior inconsistent state-

---

[1] See General Statutes § 51-199 (b) (3).

State *v.* Hamilton

ments under *Whelan*. Finally, the defendant claims that the trial court improperly admitted a video and certain photographs from the defendant's social media accounts because the probative value of that evidence was outweighed by its prejudicial effect.

For the reasons that follow, we agree with the defendant that Carr's two prior interviews with the police were improperly admitted as prior inconsistent statements under *Whelan* because the state failed to demonstrate that Carr's prior interviews were in fact inconsistent with his trial testimony. Because we conclude that the error was not harmless, we reverse the judgment of conviction and remand the case for a new trial.[2] As to the defendant's second claim, although we disagree with him that adopted statements are inadmissible as prior inconsistent statements under *Whelan*, we nevertheless conclude that the trial court improperly delegated to the jury the responsibility of determining which of Cobia's statements were adopted by Carr as his own and, therefore, were admissible hearsay under *Whelan*. Lastly, we conclude that the trial court did not abuse its discretion in admitting the video and photographs from the defendant's social media accounts.

I

On the morning of December 23, 2017, Bridgeport police responded to a "shots fired" call at the Maple Deli on the corner of Kossuth and Maple Streets in Bridgeport. Upon their arrival, the police found the victim lying on the floor of the deli with apparent gunshot wounds to his body.

Bridgeport police immediately began an investigation of the incident and obtained video surveillance footage

---

[2] Although our conclusion on the defendant's first claim is dispositive of the defendant's appeal, we nevertheless address the defendant's other claims because they are likely to arise again on remand. See, e.g., *State* v. *Williams*, 350 Conn. 363, 384 n.14, 324 A.3d 760 (2024).

State *v.* Hamilton

from the deli and other surrounding areas and businesses. The footage obtained by the police captured the exact moment the shooting took place. It showed the gunman—a tall, thin man dressed in jeans, a dark hoodie, and distinctive red and black Jordan 13 sneakers—approach the deli on foot and remove a firearm from his sweatshirt pocket. The gunman then proceeded to fire multiple shots at the victim, who was standing in front of the deli next to three other people. After being shot, the victim retreated into the deli where he eventually collapsed and died. Surveillance footage showed the gunman fleeing the scene on foot in the same direction from which he had approached.[3] No shell casings or firearms were found at the scene, but the state's firearms expert was able to determine that the bullets that killed the victim were .38 caliber full metal jacketed bullets fired from a single, unidentified revolver.

The gunman fled the scene and entered the passenger side of a 1990s green Honda Civic, which video surveillance footage showed had been circling the deli just prior to the shooting. The police identified the owner of the vehicle as twenty-one year old Carr and later secured a search warrant for both Carr's vehicle and his residence.

The police interviewed Carr on two separate occasions. At the first interview, on December 27, 2017, Carr met with law enforcement for approximately one hour, during which time the police asked Carr what he was doing on the morning of December 23, 2017, and explained to him that his vehicle was seen on surveillance camera footage taken from around the area where an incident took place. Although Carr's responses to the police were inconsistent in some respects, Carr

_____

[3] The gunman's hood was up at time of the shooting, making it difficult to see the gunman's face.

State *v.* Hamilton

indicated that he left work around 9:15 a.m. that morning and went to the area of Park Street and Barnum Avenue[4] to pick up the defendant.[5] Carr told the police that, after he picked up the defendant on Park Street, the two drove around for a little while. Carr noted that the defendant eventually directed Carr to go back to the area on Park Street where Carr had initially picked up the defendant, at which time the defendant got out of vehicle and was gone for three to four minutes before eventually returning to the vehicle. Carr said that he did not see the direction that the defendant went in and did not hear any gunshots during that time because he was listening to music and playing on his phone. At the end of the interview, the police showed Carr a portion of surveillance footage around the time of the shooting of a person walking up the block toward the deli and then running back. Carr told the police that there was "[n]o doubt" that the person in the surveillance video was the defendant, the same person who got into Carr's vehicle on the morning of the shooting.

On December 29, 2017, two days after Carr's first interview with the police, Carr and his father, Cobia, met with the police. During this second interview, which spanned more than one hour, Carr again identified the defendant as the person in the surveillance video who exited his car and ran back to it. He also provided other details about the events and circumstances of the morning of the murder. Carr explained that he and the defendant were riding around looking for weed. When the defendant told Carr to pull over again on Park Street

_____

[4] Park Street and Barnum Avenue are located in close proximity to the Maple Deli, which is located at the corner of Kossuth and Maple Streets.

[5] Carr referred to the defendant as his friend and told the police that he knew the defendant through his older brother, who had played high school basketball with the defendant. During the interview, the police showed Carr a headshot photograph of the defendant, which Carr confirmed was the defendant and the person who entered his vehicle on the morning of the shooting.

State *v.* Hamilton

and the defendant got out of the vehicle for a few minutes, Carr said that he was under the impression that the defendant was going to purchase weed from someone.[6] Carr said that the defendant did not say anything to him about the victim or otherwise express to him anything about a shooting or his intent to kill or assault the victim. Carr further told the police that he drove the defendant to the house of the defendant's girlfriend, that the defendant at one point told him to stop the vehicle, and that he saw the defendant drop a balled up plastic bag down a storm drain.[7] He added that the defendant was wearing black and red Jordan 13s that morning and that the defendant changed into sweatpants after leaving the area where the shooting took place.

The police interviewed the defendant the following day. The defendant told the police that, although Carr had contacted him on the morning of December 23, 2017, he never met up with Carr but instead fell back asleep. The defendant told the police that the only place he went that morning was to his girlfriend's house around 11 a.m. When asked how he got to his girlfriend's house, the defendant first told the police that he walked there. After further questioning, however, the defendant claimed that he actually walked part of the way, got a ride another part of the way from his cousin, and then walked the last part of the way. He told the police that he stayed at his girlfriend's house until about 4 p.m., at which point he went to a park to play basketball. The defendant also claimed during the interview that he did not own a pair of Jordan 13 sneakers. When the police asked whether there was a Facebook photo of him wearing a pair of Jordan 13 sneakers, he told them

---

[6] Carr reiterated that he never heard any gunshots after the defendant got out of his vehicle.

[7] The police searched the storm drain but were unable to recover any evidence helpful to the investigation.

State *v.* Hamilton

that he had worn them once after borrowing a pair from his cousin for his birthday. The defendant further claimed that he had never ridden in Carr's vehicle and that he did not know the victim and had never heard of him.

The state charged the defendant with murder and carrying a pistol or revolver without a permit. At the defendant's trial, the state called Carr as a witness. The prosecutor then sought to introduce Carr's two interviews with the police as prior inconsistent statements under *Whelan*, arguing that Carr was "not cooperative" in answering her questions.[8] Over defense counsel's objections, the court admitted the two interviews into evidence.

A jury found the defendant guilty of both charges. The trial court rendered judgment accordingly and imposed a total effective sentence of fifty-five years of incarceration. This appeal followed.

II

The defendant first claims that the trial court improperly admitted Carr's two interviews with the police as prior inconsistent statements under *Whelan* and § 8-5 of the Connecticut Code of Evidence. He contends that, although Carr was an uncooperative witness at trial, none of Carr's testimony was inconsistent with Carr's prior statements to the police and that the court therefore erred in allowing the state to introduce the two interviews. In response, the state contends that Carr's in-court testimony "demonstrated a broad denial of rec-

---

[8] The first interview, on December 27, 2017, was audiotaped because the police station had lost power. The second interview, on December 29, 2017, was videotaped.

We recognize that the terms "video-recorded" and "audio-recorded" may today be more technically accurate; in the present case, however, which is focused on specific provisions of the Code of Evidence, we have chosen to describe video and audio recordings by the terms as they appear in the Code.

State *v.* Hamilton

ollection and stark omissions from his prior statements
. . . .'' It argues that Carr's lack of recollection and
repeated statements that he did not want to answer
any further questions (which the state describes as a
"refusal to testify") constituted inconsistencies with his
prior statements, and, therefore, the trial court was
well within its discretion in admitting the interviews
under *Whelan*.

A

"The admissibility of evidence, including the admissi-
bility of a prior inconsistent statement pursuant to
*Whelan*," falls "within the . . . discretion of the trial
court." (Internal quotation marks omitted.) *State* v.
*Pierre*, 277 Conn. 42, 56, 890 A.2d 474, cert. denied, 547
U.S. 1197, 126 S. Ct. 2873, 165 L. Ed. 2d 904 (2006). This
court will make every reasonable presumption in favor
of upholding the trial court's ruling and reverse it only
when abuse of discretion is manifest or when an injus-
tice appears to have been done. E.g., *State* v. *Simpson*,
286 Conn. 634, 643, 945 A.2d 449 (2008).

It is well known that an out-of-court statement
offered to prove the truth of the matter asserted is
hearsay and is generally inadmissible unless an excep-
tion to the general rule applies. E.g., *State* v. *Wargo*,
255 Conn. 113, 137–38, 763 A.2d 1 (2000). In *Whelan*,
this court recognized an exception to the hearsay rule,
"allowing the substantive use of prior written inconsis-
tent statements, signed by the declarant, who has per-
sonal knowledge of the facts stated, when the declarant
testifies at trial and is subject to cross-examination."
*State* v. *Whelan*, supra, 200 Conn. 753. We have since
held that the *Whelan* rule is also applicable to audio-
taped and videotaped statements of the declarant that
otherwise satisfy its conditions. See, e.g., *State* v. *Simp-
son*, supra, 286 Conn. 642, 651–52.

State *v.* Hamilton

The *Whelan* rule has been codified at § 8-5 of the Connecticut Code of Evidence. It provides in relevant part: "The following are not excluded by the hearsay rule, provided the declarant is available for cross-examination at trial: (1) . . . A prior inconsistent statement of a witness, provided (A) the statement is in writing or otherwise recorded by audiotape, videotape or some other equally reliable medium, (B) the writing or recording is duly authenticated as that of the witness, and (C) the witness has personal knowledge of the contents of the statement. . . ." Conn. Code Evid. § 8-5.

In order for a witness' prior inconsistent statement to be admissible, the witness' trial testimony must in fact be inconsistent with the witness' prior statement. See, e.g., *State* v. *Pierre*, supra, 277 Conn. 57–58; *State* v. *Richardson*, 214 Conn. 752, 763, 574 A.2d 182 (1990). We have explained that "the inconsistency must be substantial and relate to a material matter." (Internal quotation marks omitted.) *State* v. *Bennett*, 324 Conn. 744, 769, 155 A.3d 188 (2017). To determine whether a witness' trial testimony is inconsistent with his or her prior statement, the witness' testimony must be examined as a whole to ascertain the effect of what has been said. See, e.g., *State* v. *Whelan*, supra, 200 Conn. 748 n.4. A finding of inconsistency does not necessarily require "diametrically opposed assertions" to have been made; inconsistencies may be found in "changes in position," "denial[s] of recollection," and "omissions." Id., 748–49 n.4; see also *State* v. *Simpson*, supra, 286 Conn. 649. In other words, "[i]nconsistency in effect, rather than contradiction in express terms, is the test for admitting a witness' prior statement . . . ." (Internal quotation marks omitted.) *State* v. *Gray*, 342 Conn. 657, 686, 271 A.3d 101 (2022), quoting *State* v. *Whelan*, supra, 748–49 n.4.

At trial, the prosecutor called Carr as a witness to testify. Carr answered some questions about his back-

State *v.* Hamilton

ground, law enforcement's search of his car, and the events of the morning of the shooting. When the prosecutor asked Carr who he talked to and picked up on the morning of the shooting, the following exchange occurred between the prosecutor and Carr:

"[The Prosecutor]: Okay. And who was that person that you were talking to when you got out of work on [December 23, 2017], right after your shift at [work]?

"[Carr]: I don't want to be here, to be honest. I only came here because I had the subpoena. I'm new to all this. I really only came here because I had the subpoena, and I didn't want—

* * *

"[The Prosecutor]: And so, do you pick up [the defendant] that morning?

"[Carr]: I don't even really remember what even happened around this situation. I'm literally—

"[The Prosecutor]: Do you remember speaking to the police and coming down to the police station and making a statement as to what you did and who you picked up on that day?

"[Carr]: Yes. But I don't remember any of that—

"[The Prosecutor]: The question is do you remember that? Do you remember making a statement to the police about who you picked up that morning? Do you remember making that statement? That's the question.

"[Carr]: Yes. What I'm saying is—

"[The Prosecutor]: What I'm saying is do you remember making that statement to the police?

"[Carr]: I said yes, ma'am.

State *v.* Hamilton

"[The Prosecutor]: Okay. So, you made the statement to the police as to who you picked up, and who did you tell the police that you picked up?

"[Carr]: I really don't want to be here.

"The Court: You'll be out of here that much sooner, sir, if you just answer the question.

"[The Prosecutor]: Who did you pick up, sir?

"[Carr]: I really don't want to be here.

"[The Prosecutor]: Okay. So, on December [27, 2017], you went to the police department and you made a statement saying your movements that morning. You remember that, right? Do you remember that, sir?

"[Carr]: I—what am I—what do you—what was the question?

"[The Prosecutor]: Do you remember making two statements to the police, one on [December 27, 2017], and one on [December 29, 2017], where you went through the details of what happened on the morning of [December 23, 2017], regarding [the defendant] and being in the area of 717 Kossuth Street? Do you remember those two statements that you made to the police?

"[Carr]: Yes.

"[The Prosecutor]: And who did you tell the police you picked up that morning?

"[Carr]: Ma'am, I don't—I don't even—I don't want to speak—I don't want to be here. I don't want to speak on this."

Following this exchange, the prosecutor asked that the court admit Carr's two recorded interviews with the police into evidence as prior inconsistent statements under *Whelan*, arguing that "[Carr is] not cooperative." Defense counsel objected, arguing that it would be

State *v.* Hamilton

improper to admit the statements because Carr was present in court, remembered making the statements, and could answer the questions asked. The court stated that Carr could be cross-examined about the prior statements, overruled defense counsel's objection, and admitted the statements into evidence.

The state argues that Carr's testimony clearly shows a broad denial of recollection, which it says constituted an inconsistency with Carr's prior two police statements, and, therefore, the two prior police statements were admissible under *Whelan*.[9] Although the state is correct that denials of recollection can constitute an inconsistency for purposes of *Whelan*, the record must be clear on what the witness does not recall in order for the court to adequately determine whether the testimony is in fact inconsistent with the witness' prior statements. See, e.g., *State* v. *Simpson*, supra, 286 Conn. 648 ("the trial court properly exercised its discretion because [the victim] testified that she could not remember telling the interviewers that the defendant had [sexually assaulted] her"); *State* v. *Eaton*, 59 Conn. App. 252, 263, 755 A.2d 973 ("[the witness'] posture at trial can fairly be viewed as what *Whelan* considers 'inconsistent in effect,' that is, she had given a properly executed statement to the police that she swore was truthful when given, but later failed to recall its contents at trial"), cert. denied, 254 Conn. 937, 761 A.2d 763 (2000).

Here, the state points to Carr's testimony in which Carr testified (1) "I don't even really remember what

_____

[9] We note that, during oral argument before this court, the state noted at one point that "this is not a failure to remember case." Although we acknowledge that this statement could be construed as an abandonment of this argument, we nevertheless decide to address it in this appeal because it was not entirely clear whether the state intended to abandon this aspect of its argument, it was adequately briefed, and the defendant will not suffer any prejudice by our decision to address the argument.

State *v.* Hamilton

even happened around this situation,'' and (2) ''I don't remember any of that'' as evidencing a sufficient denial of recollection to establish an inconsistency under *Whelan.* In reviewing this testimony, however, it is not at all clear to us what Carr meant by ''this situation'' when he testified that ''I don't even really remember what even happened around *this situation*'' or what ''that'' meant when he testified, ''I don't remember any of *that* . . . .'' (Emphasis added.) At each of these points, instead of clarifying with Carr what he could not remember, the prosecutor interrupted Carr and repeatedly asked him whether he remembered making statements to the police about who he picked up on the morning of December 23, 2017. In response, Carr repeatedly and unambiguously testified that he remembered making those statements to the police. Although Carr testified ambiguously about his lack of recollection, the prosecutor did not probe what Carr did and did not recall; nor did she attempt to refresh his recollection to lay a proper foundation that his testimony at trial was inconsistent with his statements to the police. On this record, therefore, we cannot reasonably conclude that Carr's ambiguous statements of ''I don't remember'' sufficiently demonstrated that Carr's trial testimony was inconsistent with his two prior police interviews.

The state next argues that Carr's uncooperativeness and so-called refusal to answer questions also constituted inconsistencies from his prior police statements, and, therefore, the trial court properly admitted the two police interviews under *Whelan.* In support of this argument, the state points to Carr's testimony where he said things like, ''I really don't want to be here'' and ''I don't want to speak on this.'' Although the Appellate Court has held that a refusal to testify about previous statements given to the police about a crime can constitute an inconsistency for purposes of *Whelan*; see *State*

State *v.* Hamilton

v. *Portee*, 55 Conn. App. 544, 557, 740 A.2d 868 (1999), cert. denied, 252 Conn. 920, 744 A.2d 439 (2000); this court has not yet addressed that precise question. The state contends that *Portee* is factually similar to the present case and is persuasive authority for why we should hold that Carr's testimony constituted an inconsistency in effect with respect to his prior statements.

In *Portee*, the defendant was convicted on a host of charges related to a shooting that caused the death of one victim and injuries to another. Id., 546–47. Harry Carter, the victim who was wounded but survived the shooting, gave a tape-recorded statement to a detective that implicated the defendant in the shooting. Id., 549–50. The prosecutor called Carter as a witness at trial, and, in response to the first question asked on direct examination, Carter stated: "I can't go through with this, man." (Internal quotation marks omitted.) Id., 550. Although Carter answered some questions thereafter about the events of the night of the incident; id., 550–51; he eventually stated, "I refuse to answer any more questions, man." (Internal quotation marks omitted.) Id., 551. "Out of the presence of the jury, the court informed Carter that if he refused to answer, he would be held in contempt. Because Carter continued to refuse to answer, the court found him in contempt and imposed a six month sentence to run consecutive[ly] to the sentence he then was serving." Id., 551. The prosecutor continued with his questioning, asking Carter about his prior statement. Id. Carter claimed not to remember it and then refused to answer again. Id. The court found him in contempt again, imposing a second six month sentence. Id. The court thereafter admitted Carter's prior statement as an inconsistent statement under *Whelan*. Id.

On appeal to the Appellate Court, the defendant in *Portee* claimed that "there was nothing in Carter's tape-recorded statement that was inconsistent with his in-

State *v.* Hamilton

court testimony because Carter refused to testify.'' Id., 556. In rejecting the defendant's claim, the Appellate Court stated that, ''[u]nder *Whelan*, inconsistencies can be shown not only by express contradictory statements but by *omissions*,'' and that the trial court ''properly could have concluded that there was [i]nconsistency in effect . . . in that Carter who had volunteered a tape-recorded statement before trial, refused to supply answers at trial regarding that same statement.'' (Citation omitted; emphasis in original; internal quotation marks omitted.) Id., 557.

Courts in other jurisdictions in interpreting their rules of evidence have reached different conclusions on whether a refusal to testify can constitute an inconsistency. Like the Appellate Court in *Portee*, some courts have held that a refusal to testify has the same effect as a lack of memory and, thus, is inconsistent with a witness' prior statements for purposes of the applicable rules of evidence. See, e.g., *United States* v. *Truman*, 688 F.3d 129, 142 (2d Cir. 2012) (holding that, when ''a witness who testifies under oath and is subject to cross-examination in a prior state court proceeding explicitly refuses to answer the same questions at trial, the refusal to answer is inconsistent with his prior testimony''); *United States* v. *Iglesias*, 535 F.3d 150, 159 (3d Cir. 2008) (holding that ''when a witness who testifies frankly under oath subject to cross-examination only two days later states that he now 'can't answer the question' and is otherwise evasive and vague, a district court may find that these statements are inconsistent''), cert. denied, 557 U.S. 913, 129 S. Ct. 2813, 174 L. Ed. 2d 307 (2009); *People* v. *Homick*, 55 Cal. 4th 816, 859, 289 P.3d 791, 150 Cal. Rptr. 3d 1 (2012) (comparing refusal to testify to claimed memory loss and holding that ''a [witness'] refusal to answer may be materially inconsistent with prior statements, exposing the witness to impeach-

ment''), cert. denied, 571 U.S. 849, 134 S. Ct. 114, 187 L. Ed. 2d 83 (2013).

Other courts have held that a witness' refusal to testify is essentially the absence of a statement, and, therefore, there is no statement or testimony with which the prior statement could be deemed inconsistent. See, e.g., *Barksdale* v. *State*, 265 Ga. 9, 11, 453 S.E.2d 2 (1995) (holding that prior statement was not admissible because witness refused to testify and, thus, "gave no testimony in court with which the prior statement could be judged to be inconsistent"); *Tyler* v. *State*, 342 Md. 766, 776, 679 A.2d 1127 (1996) (holding that witness' "refusal to testify was not inconsistent with his prior testimony" (emphasis omitted)); *State* v. *Williams*, 182 N.J. Super. 427, 434, 442 A.2d 620 (App. Div. 1982) (witness' refusal to answer questions was not testimony and, thus, was not inconsistent with prior statement); *Davis* v. *State*, 773 S.W.2d 592, 593 (Tex. App. 1989, pet. ref'd) ("[a] refusal to testify is not an inconsistent statement").

In the present case, even if we assume arguendo that a refusal to testify about a particular subject can in some circumstances constitute an inconsistency with a prior statement, the prosecutor failed to lay a proper foundation to demonstrate that Carr in fact refused to testify. Cf. *State* v. *Davis*, 298 Conn. 1, 27, 1 A.3d 76 (2010) ("counsel did not lay a proper foundation to demonstrate that the victim's testimony was, in fact, contradicted by his prior conviction of possession of a weapon in a motor vehicle"). In particular, we are not persuaded that the prosecutor and the trial court made sufficient efforts to determine whether Carr could be persuaded or prompted to testify.

An uncooperative witness in the courtroom is not that unusual; see, e.g., *State* v. *Cianflone*, 98 Conn. 454, 468–69, 120 A. 347 (1923) (explaining that witnesses

State *v.* Hamilton

"may withhold the truth, be reluctant, or evasive or equivocal or hostile"); and a litigant who is faced with one has various tools to assist in eliciting testimony from that witness. The litigant, for example, may remind the witness that he is required to answer the questions asked of him or ask the court to instruct him to do so. Indeed, "an admonition from the trial judge will have a greater impact than the efforts of an attorney to coax testimony from a witness." *McRoy* v. *United States*, 106 A.3d 1051, 1057 (D.C. 2015). If those efforts are unsuccessful, courts in Connecticut are well equipped to deal with an uncooperative witness. See, e.g., General Statutes § 51-33a (criminal contempt statute); *Hardy* v. *Superior Court*, 305 Conn. 824, 834–35, 48 A.3d 50 (2012) (discussing court's inherent authority to punish contemptuous conduct).

As this court has explained, however, an inconsistency for purposes of *Whelan* must be clear. See *State* v. *Avis*, 209 Conn. 290, 303, 551 A.2d 26 (1988), cert. denied, 489 U.S. 1097, 109 S. Ct. 1570, 103 L. Ed. 3d 937 (1989). Without a litigant's undertaking sufficient diligence to get a witness to testify to the questions asked, a court cannot fairly conclude that the witness has in fact refused to testify and, therefore, through omission, has testified inconsistently with the prior statement. Here, the prosecutor was quick to abandon her examination of Carr in favor of introducing Carr's two prior interviews with the police. Although eliciting direct testimony from a reluctant witness presents unique complications, the prosecutor must nevertheless lay a proper foundation to establish an inconsistency. See *McRoy* v. *United States*, supra, 106 A.3d 1057 ("the government may too readily (and happily) resort to the more convenient option of substituting a prior statement for in-court testimony if we do not require a record that firmly establishes that the witness is refusing to answer the questions"). The prosecutor in the

State *v.* Hamilton

present case should have taken some additional steps to encourage or prompt Carr to respond to her questions or have enlisted the trial court's assistance in doing so. There was no indication that any such attempt would be futile, as Carr proceeded to answer some questions from counsel about the interviews after the court admitted the interviews as full exhibits. For the trial court's part, it should have required the prosecutor to make some additional attempts to get or prompt Carr to respond to her questioning. Although the court said to Carr at one point that Carr would get out of court "much sooner" if he "just answer[ed] the question," this was hardly a firm admonishment to get him to answer the prosecutor's questions. Unlike the facts in *Portee*, the prosecutor in the present case never requested that the court find the witness in contempt, and the court never admonished Carr that he could be found in contempt for refusing to answer.

In sum, even if we assume without deciding that a witness' lack of cooperation in the form of refusing to testify about a particular subject at trial may be treated as inconsistent with a witness' prior out-of-court statement, the state has failed to sufficiently demonstrate that Carr in fact refused to testify or that his trial testimony was otherwise inconsistent with his prior interview statements. We therefore conclude that the trial court abused its discretion in admitting Carr's two prior interviews with the police under *Whelan*.

B

Having concluded that Carr's two interviews with the police were admitted in error, we must now determine whether the error was harmful. When an improper evidentiary ruling is not constitutional in nature, the defendant bears the burden of demonstrating harm. E.g., *State* v. *Lanier*, 347 Conn. 179, 193, 296 A.3d 770 (2023). To satisfy this burden, the defendant must demonstrate

State *v.* Hamilton

that "the jury's verdict was substantially swayed by the error." (Internal quotation marks omitted.) *State* v. *Outlaw*, 350 Conn. 251, 283, 324 A.3d 107 (2024); see also *State* v. *Holley*, 327 Conn. 576, 617, 175 A.3d 514 (2018) ("a nonconstitutional error is harmless when an appellate court has a fair assurance that the error did not substantially affect the verdict" (internal quotation marks omitted)). "[W]hether [an improper ruling] is harmless in a particular case depends [on] a number of factors, such as the importance of the witness' testimony in the [defendant's] case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case." (Internal quotation marks omitted.) *State* v. *Fernando V.*, 331 Conn. 201, 215, 202 A.3d 350 (2019).

The defendant argues that the admission of Carr's two interviews with the police was harmful because Carr was the state's key witness and his interview statements were the only evidence identifying the defendant as the person shown on video surveillance footage exiting Carr's vehicle and returning to it a moment after the shooting. He contends that no one else identified the defendant and that no physical evidence linked the defendant to the shooting. He further contends that Carr's interview statements tied the state's case together by connecting the defendant to Carr's vehicle, the surveillance videos, and the black and red Jordan 13 sneakers that the shooter was seen wearing.

At oral argument before this court, the state conceded that it would be "hard-pressed" to make a harmless error argument if both interviews were inadmissible. In its brief, however, it argues that any error was harmless. Suffice it to say that we agree with the state that one

State *v.* Hamilton

would be hard-pressed on this record to claim harmless error.

Carr's interviews with the police were indisputably important to the state's case because it was during these interviews that Carr identified the defendant as the person seen in the surveillance video walking up to the deli and then running back from that area shortly after the shooting. Specifically, during Carr's first interview with the police, Carr stated there was "[n]o doubt" that the person in the surveillance video who was running back from the deli was the defendant and the same person who got into Carr's vehicle. During the second interview, he again identified the defendant as the person who got in and out of his vehicle on the morning of the murder, and he provided other significant details regarding the events of that day. Other than the admission of Carr's two prior interviews into evidence, no one else identified the defendant as the shooter or as the person in the video surveillance footage of the crime scene. There was also no other physical evidence, such as fingerprints or DNA, that otherwise connected the defendant to the crime.

The state contends that the admission of Carr's two interviews was harmless because there was circumstantial evidence that demonstrated the defendant's identity as the shooter. It argues that (1) the jury was able to watch the surveillance videos, including, most notably, that of the shooting, and view the build of the shooter and compare that build with that of the defendant in his videotaped interview with the police and other surveillance videos that were in evidence, (2) the jury viewed a photograph of the defendant wearing Jordan 13 sneakers, which the shooter is seen wearing in surveillance videos, as well as a Snapchat video of the defendant holding a revolver with a copper jacketed bullet, which the state's firearms expert testified was consistent with the type of revolver and bullet used to

State *v.* Hamilton

kill the victim, and (3) certain messages between Carr and the defendant's brother, about when Carr was picking up the defendant on the morning of the shooting, allowed the jury to infer that the defendant committed the murder. Although we agree that this evidence was corroborative of the defendant's identity as the shooter, common sense and human experience tell us that the testimony of a sole witness that expressly identifies a defendant on surveillance video as the one fleeing the scene of the crime would substantially sway a jury, whereas more attenuated and circumstantial evidence like the kind the state points us to would have considerably less impact. Because we cannot say with fair assurance that the jury's verdict was not substantially swayed by the trial court's error, we conclude that the defendant is entitled to a new trial.

Our conclusion is buttressed by the way Carr's two interviews were used by the prosecutor during closing arguments. The prosecutor spent a significant amount of time talking about Carr, walking the jury through Carr's interviews with the police, and tying other circumstantial evidence together with statements Carr had made during his interviews. For example, in discussing Carr's prior interviews with the police during her closing arguments, the prosecutor acknowledged that, although many things Carr said during the interviews were inconsistent, he was consistent about the fact that it was the defendant who was with him on the morning of the murder. The prosecutor stated: "[In Carr's statements on both December 27 and 29, 2017], he says he was meeting [the defendant] that morning. All the way through. That's not inconsistent. That one fact is not inconsistent. And ladies and gentlemen of the jury, I would submit to you that that is what this case comes down to, identification. Who was that shooter? Because everything else is on video. You can see it as well as I can. The question for you is who is that. And [Carr]

State *v.* Hamilton

was consistent all the way through those statements, he was meeting his friend, [the defendant].'' The prosecutor then proceeded to replay audio from Carr's interview with the police in which Carr identified the defendant as the person in the surveillance video.

In a final effort to persuade us that the error was harmless, the state argues that defense counsel was able to cross-examine Carr about the statements during trial. Although defense counsel did have an opportunity to cross-examine Carr regarding his two prior interviews with the police that were erroneously admitted, we are not persuaded, on this record, that that questioning sufficiently mitigated the substantial prejudice stemming from the erroneous admission of such interviews. See, e.g., *State* v. *Grenier*, 257 Conn. 797, 812, 778 A.2d 159 (2001) (trial court's curative instruction did not sufficiently mitigate substantial prejudice that resulted from inadmissible testimony of two experts who vouched for credibility of victim witness). Accordingly, we conclude that the defendant is entitled to a new trial.

III

Although we have already concluded that Carr's two interviews with the police were improperly admitted into evidence under *Whelan* because the state failed to demonstrate that Carr's testimony at trial was inconsistent with his statements made during those interviews, the defendant claims that the admission of Carr's second interview with the police was improper for another reason. He claims that the second interview contained statements by Carr's father, Cobia, and that the trial court incorrectly had concluded that Cobia's statements could be admitted under *Whelan* as ''adoptive admissions'' of Carr. The defendant argues that a *Whelan* statement should not include purportedly adoptive admissions by a witness. In the alternative, the defen-

State *v.* Hamilton

dant contends that the court nevertheless erred in admitting Cobia's statements because there was not unequivocal, positive, and definite proof that Carr had intended to adopt those statements as so-called "adoptive admissions" of a witness.

To the extent the defendant's claim requires us to interpret our Code of Evidence, our standard of review is plenary. *State* v. *Saucier*, 283 Conn. 207, 218, 926 A.2d 633 (2007). Otherwise, our review of the trial court's decision to admit evidence, "if premised on a correct view of the law, [is] for an abuse of discretion." *State* v. *Jones*, 351 Conn. 324, 332, 330 A.3d 118 (2025).

The following additional facts and procedural history are relevant to the defendant's claim. On December 29, 2017, Cobia joined Carr at his second interview with the police. Cobia was an active participant in that interview, speaking more than 100 times, with his statements ranging in kind and degree. For example, Cobia told the police that he told "[Carr] to stop . . . fucking around with [the defendant] because he was starting to do too much . . . [s]neaky shit that you don't know about"; that "[the defendant] is so little you would never think that he got the heart to do stuff like that"; that "[the defendant] ain't a smart kid"; and that "[the defendant] do dumb stuff." During other parts of the interview, Cobia directed Carr on multiple occasions to tell the police "what they need to know" and repeatedly questioned rhetorically "why [the defendant] would put [Carr] in a situation like that when he know he doesn't hang in the street like that with them."

On the first day of trial, the prosecutor sought to introduce both of Carr's recorded interviews with the police under *Whelan*. Defense counsel objected to the admission of both interviews on the basis that Carr was present in court, remembered making the statements, and could answer the questions asked. Over defense

State *v.* Hamilton

counsel's objection, the court admitted the entirety of the two police interviews into evidence.

After the prosecutor began playing Carr's December 29, 2017 interview for the jury, defense counsel objected again. Outside the presence of the jury, defense counsel argued that the December 29, 2017 interview contained statements made by Cobia, which he argued were not admissible under *Whelan* as prior inconsistent statements of Carr. He further argued that Cobia's statements were inflammatory with respect to the defendant and were not relevant to the events surrounding the murder.

The prosecutor claimed that Cobia's statements were admissible under *Whelan* because Carr adopted certain statements made by Cobia during the course of that interview.[10] The trial court ultimately agreed with the prosecutor and concluded that, to the extent the statements made by Cobia during the course of that interview were adopted by Carr, they were subject to admission under *Whelan*. The court brought the jury back into the courtroom and allowed the prosecutor to play the remainder of the interview.

The following day, outside the presence of the jury, defense counsel asked for a curative instruction as to Carr's second interview with the police. Defense counsel described Cobia's statements in the videotaped interview as a "character assassination" of the defendant and argued that the jury should be instructed to disregard them. In response, the court indicated that it was its intention to give a brief instruction to the jury to "pretty much disregard [Cobia's] statements, except to the extent that [Carr] adopted them either verbally, by saying yes or agreeing to them, or by nodding his

---

[10] Defense counsel acknowledged that Carr "adopt[ed] maybe some" of Cobia's statements during the interview but argued that Carr did not adopt every statement.

State *v.* Hamilton

head in the affirmative,'' and that it would give a more detailed instruction during its final charge.

After the jury returned to the courtroom, the court addressed the jury regarding Carr's second interview. It stated: ''[I]f you recall from the playing of state's exhibit 17, the interview of [Carr], while his father, [Cobia] was present, [Cobia's] statements are not in evidence, except to the extent [Carr] adopted any statements that [Cobia] made. So, for example, if [Cobia] said the car is blue, and if you find that [Carr], the witness, by his actions, as in nodding his head or saying yes or agreeing to that statement, then you may—but it's up to you, ultimately; I'm not telling you to make this inference. It's up to you based upon your close, careful, and considered watching of the video and listening to the—to the interview to decide whether the witness, [Carr], adopted those statements of [Cobia]. Otherwise, things that [Cobia] said, which the witness did not adopt, [are] not in evidence.''

The court reiterated its instruction in its final charge to the jury. It explained that ''[a] recording of a statement made by [Carr] to the police in the presence of his father has been admitted into evidence. His father, [Cobia], made a number of statements during [Carr's] statement. [Cobia's] statements are not evidence except to the extent that you find that the witness, [Carr], agreed and/or adopted [Cobia's] statements, whether he did so verbally, by agreeing with [Cobia's] statements, or through his actions, such as nodding his head in the affirmative. Any other statements made by [Cobia] during the course of the interview are not evidence, and you must disregard those statements.'' The court continued: ''It is up to you as the judges of the facts to carefully review, listen to, and watch [Carr's] interview, apply your careful and considered judgment, and decide which of his father's statements, if any, were adopted

State *v.* Hamilton

by [Carr] and reject any of [Cobia's] statements [that] you determine were not adopted by [Carr]."

A

At the outset, we note that, in advancing his argument in his brief, the defendant refers to the statements at issue as "adoptive admissions" of Carr. Indeed, he states that this court should hold that a *Whelan* statement may not include purported "adoptive admissions" by a witness. In advancing his claim, the defendant first argues that a trial court may not admit hearsay within hearsay unless each part of the combined statements is independently admissible under a hearsay exception. He further argues that Carr's statement to the police is one level of hearsay, to which *Whelan* applies, but Cobia's statements within Carr's statement constitute a second level of hearsay and must fit a separate hearsay exception to be admitted. He also contends that the "adoptive admissions" hearsay exception under § 8-3 (1) (B) of the Connecticut Code of Evidence is limited to statements of a party opponent and should not apply in the present case because Carr is a nonparty witness.[11] The defendant points to this court's decision in *State* v. *Pierre*, supra, 277 Conn. 64, as the only Connecticut criminal case to consider whether to admit, as hearsay within hearsay, adoptive admissions contained within a *Whelan* statement and suggests that *Pierre* limits the admissibility of adoptive admissions within a *Whelan* statement to those of a defendant.

On the basis of our review of the record, however, it is evident that the defendant's characterization of the present issue as one of hearsay within hearsay or as

_____

[11] Connecticut Code of Evidence § 8-3 provides in relevant part: "The following are not excluded by the hearsay rule, even though the declarant is available as a witness:

"(1) . . . [a] statement that is being offered against a party and is . . . (B) a statement that the party has adopted or approved . . . ."

State *v.* Hamilton

"adoptive admissions" under § 8-3 (1) (B) is not accurate, and we take a moment to clarify what is actually at issue. Importantly, the trial court in the present case did not consider Cobia's statements within Carr's interview statement as a second layer of hearsay. Rather, the court understood Carr's second police interview as a single level of hearsay, which included not only Carr's responses to questioning from the police but also Cobia's statements that Carr adopted as his own during that interview, that fell within a single hearsay exception—a prior inconsistent statement under *Whelan*. The court stated in no uncertain terms that, "to the extent that [Carr] adopts those statements by his father, I think *they are statements by this witness* and subject to *Whelan*." (Emphasis added.) The court reiterated to the jury that "Cobia's statements are not in evidence, except to the extent [Carr] adopted any statements that [Cobia] made." Thus, we are not presented with a question of hearsay within hearsay; nor are we presented with a question of whether the trial court improperly admitted a hearsay statement under the adoptive admission of a party opponent exception to hearsay under § 8-3 (1) (B). Instead, we are presented with the question of whether a statement that was adopted by a witness as his own, which we refer to in this opinion as an "adopted statement,"[12] can constitute a prior inconsistent state-

[12] Although the concept of an "adoptive admission" under § 8-3 (1) (B) is similar in some respects to the issue of whether a witness has adopted someone else's statement as the witness' own, the term "adoptive admission" has become a term of art under our law. It refers to a specific type of admission whereby a *party* adopts or approves a statement made by someone else, effectively making it the party's own statement. See Conn. Code Evid. § 8-3 (1) (B); see also E. Prescott, Tait's Handbook of Connecticut Evidence (6th Ed. 2019) § 8.13.6, p. 536 (describing adoptive admission, in general, as one in which "a *party's* conduct indicates that the *party* assents to or adopts a statement made by another person" (emphasis added)). The term "adoptive admission" is generally not used when a nonparty witness adopts or approves someone else's statement. To avoid any confusion in the present appeal, we forgo the use of the term "adoptive admission" in our consideration of whether adopted statements of a witness are admissible as prior inconsistent statements under *Whelan*. We simply refer to them as "adopted statements."

State *v.* Hamilton

ment under *Whelan*. The defendant, therefore, can best be understood as arguing that adopted statements should not be admissible as prior inconsistent statements under *Whelan*.

As we have explained, the *Whelan* rule has been codified at § 8-5 of the Connecticut Code of Evidence. It provides in relevant part: "The following are not excluded by the hearsay rule, provided the declarant is available for cross-examination at trial: (1) . . . A prior inconsistent statement of a witness, provided (A) the statement is in writing or otherwise recorded by audiotape, videotape or some other equally reliable medium, (B) the writing or recording is duly authenticated as that of the witness, and (C) the witness has personal knowledge of the contents of the statement. . . ." Conn. Code Evid. § 8-5.[13]

In *Whelan*, this court carved out a relatively narrow hearsay exception, allowing for the substantive use of a prior written inconsistent statement that has been signed by the witness and meets other specific criteria that reasonably assures the reliability of the statement.[14] *State* v. *Whelan*, supra, 200 Conn. 753. This court, however, has never taken exception to an adopted statement of a witness (written or otherwise) being admitted under *Whelan*. For example, in *State* v. *Pierre*, supra,

---

[13] Section 8-1 (1) of the Connecticut Code of Evidence defines "[s]tatement" as "(A) an oral or written assertion or (B) nonverbal conduct of a person, if it is intended by the person as an assertion." While assertion is not defined in the Code of Evidence, by definition, an "assertion" is "[a] declaration or allegation" or "[a] person's speaking, writing, acting, or failing to act with the intent of expressing a fact or opinion; the act or an instance of engaging in communicative behavior." Black's Law Dictionary (12th Ed. 2024) p. 142; see also *United States* v. *Lewis*, 902 F.2d 1176, 1179 (5th Cir. 1990) (explaining that term " 'assertion' . . . has the connotation of a positive declaration").

[14] The *Whelan* rule has been expanded to include statements recorded by audiotape, videotape or some other equally reliable medium. See, e.g., *State* v. *Simpson*, supra, 286 Conn. 642; *State* v. *Hopkins*, 222 Conn. 117, 123 n.3, 609 A.2d 236 (1992).

State *v.* Hamilton

277 Conn. 42, after meeting with the witness in that case, the police prepared a written statement for the witness' review. Id., 56. After reviewing the statement written by the police, and editing only portions of it, the witness subsequently signed the document in eight different places and indicated that he was giving the statement of his own free will. Id., 55, 62. We had no issue with the fact that it was the police who initially prepared the statement (i.e., made the statement) because the witness ultimately adopted the statement as his own as evidenced by a written assertion. See id. Although *Pierre* and other cases involved written statements that were adopted by virtue of the witness' signature, we see no reason why statements that are adopted by a verbal assertion or by nonverbal conduct intended as an assertion (and satisfy the other requirements of *Whelan* and § 8-5 of the Connecticut Code of Evidence) should be treated any differently.

The following scenario helps illustrate the point. Consider a situation in which, during a videotaped interview of a witness, the police officer says to the witness, "you saw the defendant stab the victim." The witness responds to this statement with an emphatic up and down nod. By and through the witness' clear and unequivocal conduct, the witness adopted all of the exposition and assertions of the officer's statement, indicating that he saw the defendant stab the victim. The witness' nonverbal conduct under these circumstances constitutes a "[s]tatement" under § 8-1 (1) (B) of the Connecticut Code of Evidence because the witness' nonverbal conduct was clearly intended by the witness as an assertion.[15] Consistent with the defendant's posi-

---

[15] "In some situations, [nonverbal] conduct may be just as assertive as words." 2 R. Mosteller et al., McCormick on Evidence (9th Ed. 2025) § 250, p. 223; see, e.g., Conn. Code Evid. § 8-1 (1) (B) (providing that "nonverbal conduct of a person, if it is intended by the person as an assertion," falls within definition of "[s]tatement" for purposes of hearsay rule); *Stevenson* v. *Commonwealth*, 218 Va. 462, 463, 465, 237 S.E.2d 779 (1977) (when police officer requested that defendant's wife give him clothes defendant had been

State *v.* Hamilton

tion, however, the witness' assertion that he saw the defendant stab the victim would be inadmissible under *Whelan* as a prior inconsistent statement, even if the witness testified at trial that the defendant never stabbed the victim or that he did not recall seeing the defendant stab the victim. We are not persuaded that our Code of Evidence or other principles of fairness mandate the rule for which the defendant advocates.

We conclude that a witness' prior inconsistent statement under *Whelan* may include not only statements made expressly by the witness but also statements that are adopted by the witness. The adoption, however, must be unequivocal, positive, and definite in nature to meet the definition of "[s]tatement" under § 8-1 (1) of the Code of Evidence. See, e.g., *State* v. *King*, 249 Conn. 645, 670, 735 A.2d 267 (1999) (explaining that conduct must be "assertive in nature, that is, meant to be a communication—like the nodding or shaking of the head in answer to a question—[to be] treated as a statement" (internal quotation marks omitted)); *State* v. *Burton*, 191 Conn. App. 808, 830, 216 A.3d 734 ("an out-of-court nod or shake of the head in response to a question is as much an assertion subject to the hearsay rules as if the person had answered the question verbally or in writing"), cert. denied, 333 Conn. 927, 217 A.3d 995 (2019).

In further advancing his argument that no adopted statements of a witness should be admitted under *Whelan* as a prior inconsistent statement, the defendant points to some of our case law in which we have held that evidence of silence by a defendant in the face of an accusation may constitute an adoptive admission and may be construed as an admission of guilt against that defendant. See *State* v. *Pierre*, supra, 277 Conn.

wearing on day of certain homicide, wife's giving of shirt to officer constituted nonverbal assertion that defendant wore that shirt on day of homicide).

State *v.* Hamilton

72–73; *State* v. *Harris*, 182 Conn. 220, 228–29, 438 A.2d 38 (1980). He argues that a witness has no natural incentive to deny an inculpatory statement if he is not inculpated by it. He also argues that it costs a witness nothing to remain silent, or even to agree, when he hears someone accuse another individual of a crime.

As we previously explained, this is not a case involving the adoptive admissions by a party opponent exception to the hearsay rule. See Conn. Code Evid. § 8-3 (1) (B). Nor does it involve any issue of adoption by silence. The trial court's instruction did not apply to silence by Carr, and the state has not claimed that the reasoning in cases like *Pierre*, relating to the admission of a defendant's silence in the wake of an accusation, applies to a nonparty witness such as Carr. We recognize that a witness may have no natural incentive to deny an inculpatory statement if he is not inculpated by it, and a defendant can object to the admission of any evidence on that basis if the state seeks to introduce a witness' silence in that way. See *State* v. *Vitale*, 197 Conn. 396, 405, 497 A.2d 956 (1985) (when silence is offered as nonverbal conduct, such evidence is inadmissible unless it is "a reliable indicator of what the [proffering party] claims it tended to communicate"). But that is not a valid reason to exclude all adopted statements from being admitted as inconsistent statements under *Whelan*. Although the defendant argues that a witness may too easily agree with a statement that inculpates another individual, the defendant is free to explore the witness' motive in adopting a statement through cross-examination, just like he is with any other statement admitted under *Whelan*. See, e.g., *State* v. *Pierre*, supra, 277 Conn. 61 (emphasizing that, unless "the trial court is persuaded, in light of the circumstances under which the statement was made, that the statement is so untrustworthy that its admission into evidence would subvert the fairness of the fact-finding process," a statement

State *v.* Hamilton

that otherwise meets the *Whelan* criteria "is admissible as substantive evidence; like all other evidence, its credibility is grist for the cross-examination mill" (internal quotation marks omitted)).

In light of the foregoing, we conclude that a statement made by someone other than a witness, but which the witness adopts as his own, can constitute a prior inconsistent statement under *Whelan* and § 8-5 (1) of the Connecticut Code of Evidence.

B

We turn next to the defendant's alternative claim that the court erred in admitting Cobia's statements because there was not unequivocal, positive, and definite proof that Carr intended to adopt those statements as his own. The defendant directs us to a list of statements made by Cobia that he argues disparaged the defendant. He contends that Carr did not adopt any of these statements as his own because Carr reacted equivocally, or did not react at all, to his father's comments, and, therefore, the trial court improperly admitted Cobia's statements into evidence. The state, by contrast, contends that the court properly exercised its discretion in admitting, within Carr's second recorded interview with the police, statements made by Cobia because Carr adopted several of those statements and they therefore became part of his broader *Whelan* statement to the police.

We disagree with both parties' arguments because we conclude that the trial court erred for a more fundamental reason. Despite the parties' claims that the court either properly or improperly admitted Cobia's statements into evidence, the record shows that the trial court did not in fact decide whether *any* of his statements were admissible under *Whelan* as adopted hearsay statements of Carr. Rather, the trial court wholly delegated this responsibility to the jury, instructing

State *v.* Hamilton

jurors to "carefully review, listen to, and watch [Carr's] interview, apply [their] careful and considered judgment, and decide which of his father's statements, if any, were adopted by [Carr] and reject any of [Cobia's] statements [that they] determine were not adopted by [Carr]." This court, however, has stated that "whether a challenged statement properly may be classified as hearsay and whether a hearsay exception properly is identified are legal questions" that are to be decided by the court. *State* v. *Saucier*, supra, 283 Conn. 218. Instead of requiring the jurors to examine all of Cobia's statements made during Carr's second interview and allowing them to determine which statements were adopted by Carr, and were therefore admissible, the court should have determined the admissibility of the statements and excluded from the jury's consideration any statements that it concluded were inadmissible. Accordingly, if the admissibility of Cobia's statements as adopted hearsay statements of Carr arises again on remand, it is an issue for the court to decide, not the jury.[16]

IV

The defendant's final claim is that the trial court abused its discretion in admitting (1) a Facebook photo of him wearing black and red Jordan 13 sneakers, (2) a Snapchat video of him holding a firearm, and (3) still images of that same Snapchat video in which he is purportedly holding a firearm. In the defendant's view, this evidence was more prejudicial than probative and should have been excluded.

---

[16] Defense counsel also objected to some of Cobia's statements as more prejudicial than probative. Counsel never articulated with specificity which statements he objected to on this basis. On remand, if the trial court determines that certain statements by Cobia were adopted by Carr and are admissible as inconsistent statements by Carr, nothing we say precludes defense counsel from objecting on the ground that the prejudicial value outweighs any probative value and by identifying the specific statement to which the objection is made.

State *v.* Hamilton

The following additional facts and procedural history are relevant to the resolution of this claim. During the investigation, the police discovered a Facebook photo of the defendant wearing a pair of black and red Jordan 13 sneakers, which are the same type of sneakers that were worn by the shooter during the commission of the crime. The police also discovered a Snapchat video, which was posted approximately twelve days after the murder, of the defendant holding a dark colored revolver. This revolver was loaded with copper jacketed bullets, which resembled the bullets that were recovered from the victim's body.[17] When the defendant was interviewed by the police, he denied owning black and red Jordan 13 sneakers, but when asked if there was a Facebook photo of him wearing them, the defendant admitted that he borrowed a pair from his cousin on his birthday the previous year.[18] Later in the interview, the defendant denied owning a gun or ever having posted photos with a gun.

Prior to trial, the defendant filed a motion in limine seeking to preclude the state from introducing certain evidence, including, among other things, the Facebook photo, the Snapchat video, and any still photos from

[17] At trial, the prosecutor presented expert testimony from Marshall Robinson on the subjects of firearms, ballistics, and tool mark identification. Robinson examined the bullets retrieved from the victim's body and concluded that they were both .38 caliber full metal, copper jacketed bullets that were fired from a single, unidentified revolver. He also examined one of the still images from the Snapchat video, depicting the defendant holding a firearm. Robinson explained that the firearm in the photo resembled a Smith and Wesson revolver. The revolver had two different cartridges in the cylinder, one was a lead bullet and the other was a copper jacketed bullet similar to those retrieved from the victim's body.

Robinson also explained that, unlike semiautomatic handguns, revolvers do not eject cartridge cases. Instead, after a bullet is fired from a revolver, the cartridge case will remain in the cylinder of the gun until it is manually removed.

[18] During the investigation, the police also spoke with the defendant's brother, who stated that the defendant had Jordan 13 sneakers and that they were the defendant's favorite sneakers.

State *v.* Hamilton

the Snapchat video. The defendant argued that this anticipated evidence was unreliable because the images were taken from the Internet, and it was unknown who took the images, when the images were captured, and who posted and labeled these items. He also argued that the evidence lacked a foundation, relied on speculation and hearsay, was remote, and that its probative value was outweighed by the potential prejudice and confusion it would cause the jury. The prosecutor opposed the motion, arguing that the challenged evidence was probative of the shooter's identity. The trial court agreed with the prosecutor and denied the defendant's motion.

As we have explained, "we review the trial court's decision to admit or exclude evidence, if premised on a correct view of the law, for an abuse of discretion." *State* v. *Jones*, supra, 351 Conn. 332. "The trial court has wide discretion to determine the relevancy of evidence [and balance its probative value against the danger of unfair prejudice] . . . . Thus, [w]e will make every reasonable presumption in favor of upholding the trial court's [ruling] . . . ." (Internal quotation marks omitted.) *State* v. *Bermudez*, 341 Conn. 233, 245, 267 A.3d 44 (2021).

"Evidence is relevant if it has *any* tendency to make the existence of any fact that is material to the determination of the proceeding more probable or less probable than it would be without the evidence." (Emphasis in original; internal quotation marks omitted.) *State* v. *Patterson*, 344 Conn. 281, 294, 278 A.3d 1044 (2022); see also Conn. Code Evid. § 4-1. Although we have explained that "photographic [or videographic] evidence is admissible [when] the photograph [or video] has a reasonable tendency to prove or disprove a material fact in issue"; (internal quotation marks omitted) *State* v. *Satchwell*, 244 Conn. 547, 574, 710 A.2d 1348 (1998); such evidence may be excluded "if the court, in its discretion, deter-

State *v.* Hamilton

mines that the probative value of the photograph [or video] outweighs the prejudicial effect it might have on the jury.'' (Internal quotation marks omitted.) *State* v. *Best*, 337 Conn. 312, 322, 253 A.3d 458 (2020); see also Conn. Code Evid. § 4-3. Evidence that may be excluded under this principle, however, ''is not to be confused with evidence that is merely damaging. . . . All evidence adverse to a party is, to some degree, prejudicial.'' (Internal quotation marks omitted.) *State* v. *Williams*, 350 Conn. 363, 388, 324 A.3d 760 (2024). The evidence ''is inadmissible only if it creates *undue* prejudice so that it threatens an injustice were it to be admitted.'' (Emphasis in original; internal quotation marks omitted.) *State* v. *Jacobson*, 283 Conn. 618, 639, 930 A.2d 628 (2007). Accordingly, the question is not whether the evidence is damaging to the defendant but ''whether the adverse impact of the challenged evidence outweighs its probative value.'' (Internal quotation marks omitted.) *State* v. *Pappas*, 256 Conn. 854, 888, 776 A.2d 1091 (2001).

The defendant claims that the trial court should have excluded from evidence the Facebook photograph, the Snapchat video, and the still images from the Snapchat video because their probative value was outweighed by the danger of unfair prejudice. The defendant maintains that the connection between the challenged evidence and the identity of the shooter is ''far too tenuous'' to satisfy § 4-3 of the Connecticut Code of Evidence. He argues that, because a .38 revolver is a common firearm and because Jordan 13 sneakers are not rare, the jury would have to '' 'resort to impermissible surmise or conjecture' '' to conclude that the sneakers and the gun that the defendant is pictured with were the same sneakers worn, and the same gun used, by the shooter. He contends that this evidence lacks a logical connection to the charged offense, and it is unduly prejudicial because it will mislead the jury. We are not persuaded.

State *v.* Hamilton

Although the challenged evidence is not direct evidence of the defendant's identity as the shooter or necessarily conclusive on that issue, evidence is not rendered inadmissible just because it is circumstantial or not conclusive. See, e.g., *State* v. *Patrick M.*, 344 Conn. 565, 577, 280 A.3d 461 (2022); *State* v. *Patterson*, supra, 344 Conn. 295. Indeed, "[i]t is not one fact, but the cumulative impact of a multitude of facts [that] establishes guilt . . . ." (Internal quotation marks omitted.) *State* v. *Farnum*, 275 Conn. 26, 36, 878 A.2d 1095 (2005). The challenged evidence, viewed in context with the other evidence in the record, was clearly probative of the defendant's identity as the shooter. The video surveillance footage showed the shooter wearing Jordan 13 sneakers that matched those worn by the defendant in the photograph and the state's ballistic expert testified that the revolver in the Snapchat video was consistent with the type of revolver and bullet that killed the victim. Although the defendant claims that the evidence is too tenuous to be admissible under § 4-3 of the Code of Evidence, we do not agree. On this record, and in light of the broad leeway that the trial court has in determining whether the probative value of such evidence outweighs its prejudicial effect, we conclude that the trial court properly permitted the state to introduce the challenged photographs and video. See, e.g., *State* v. *Best*, supra, 337 Conn. 325.

The judgment is reversed and the case is remanded for a new trial.

In this opinion the other justices concurred.